# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JAMES JOSEPH MELUZIO,
        Appellant,

                                               (Lead case)

v.                                         CIVIL ACTION NO. 1:11CV58
                                              BANKRUPTCY NO. 1:10:BK2083
                                              ADV. P. NO. 1:10AP165
                                                   (Judge Keeley)

CAPITAL ONE BANK (USA), N.A.,
        Appellee.

---

MARY KATHRYN ROMEO, and
THOMAS JOSEPH ROMEO,
        Appellants,

                                               (Member case)

v.                                         CIVIL ACTION NO. 1:11CV59
                                              BANKRUPTCY NO. 1:10BK1814
                                              ADV. P. NO. 1:10AP124
                                                   (Judge Keeley)

CAPITAL ONE BANK (USA), N.A.,
        Appellee.

---

TINA KAY JONES, and
JASON MICHAEL JONES,
        Appellants,

                                               (Member case)

v.                                         CIVIL ACTION NO. 2:11CV33
                                                BANKRUPTCY NO. 2:10BK1935
                                              ADV. P. NO. 2:10AP125
                                                   (Judge Keeley)

CAPITAL ONE BANK (USA), N.A.,
        Appellee.

## APPELLANTS' COMBINED BRIEF ON APPEAL

TODD B. JOHNSON (WV State Bar No. 9261)
JOHNSON LAW, PLLC
PO Box 519
Morgantown, WV  26507
(304) 292-7933 phone
(304) 292-7931 facsimile
*Counsel for Plaintiffs-Appellants*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Citations ……………………………………………………………………… iii

Statement of Appellate Jurisdiction ………………………………………………… 1

Statement of the Issues ………………………………………………………………… 1

Standard of Appellate Review ……………………………………………………… 1

Statement of the Cases ………………………………………………………………… 2

      Nature, Course, and Disposition of the Cases ………………………………… 2

      Statement of Facts ……………………………………………………………… 3

      Legal Framework ……………………………………………………………… 4

      Vital State Interest ……………………………………………………………… 4

      Presumption Against Preemption …………………………………..………………… 5

      Preemption Analysis Standard ………………………………………………... 6

      Conflict Preemption ……………………………………………………..…. 6

      Defendant's Proposed Void ………………………………………..…………………... 7

Argument ……………………………………………………………………………… 7

    I.    WV Code § 46A-2-128(e) does not affect a national bank's non-real estate lending powers. …………………………………………..…………………… 7

    II.    WV Code § 46A-2-128(e) falls within the "criminal law" savings clause found in 12 C.F.R. § 7.4008(e)(3). ………………………………..… 8

    III.    WV Code § 46A-2-128(e) falls within the "right to collect debts" savings clause found in 12 C.F.R. § 7.4008(e)(4). ……………………….… 8

    IV.    WV Code § 46A-2-128(e)'s interference with a national bank's non-real estate lending activities is no more than incidental. …………… 10

    V.    Expert testimony is required to properly determine the true extent of WV Code § 46A-2-128(e)'s effect on a national bank's lending. ……… 12

i

VI.     12 C.F.R. § 7.4008 is not the proper basis for determining preemption. …  12

Conclusion ……………………………………………………………………… 16

Certificate of Service ……………………………………………………………… 17

Addendum ……………………………………………………………………… 18

## TABLE OF CITATIONS

**Cases**                                                                           **Page**

Aguayo v. United States Bank, 658 F. Supp. 2d 1226 …………………………… 8, 10, 11

Alkan v. Citimortgage, Inc., 336 F.Supp.2d 1061 (N.D. Cal., 2004)  …………… 8, 9

Atherton v. Federal Deposit Insurance Corporation, 519 U.S. 213 (1997) ………. 9, 11

Barnett Bank of Marion Cnty., N.A. v. Nelson, 517 U.S. 25 (1996) …………….. 14, 15

Frye v. Bank of America, No. 3:10-cv-47 (N.D.W.Va Aug. 16, 2010) ………….. 10, 11

Harless v. First Nat'l Bank, 162 W.Va. 116, 246 S.E.2d 270 (1978) ……………. 4

Hood v. Santa Barbara Bank & Trust, 49 Cal.Rptr.3d 369,
        143 Cal.App.4th 526 (Cal. App., 2006) …………………………………….. 9

Hussey-Head v. World Savings & Loan Assn., 111 Cal.App.4th 773,
        4 Cal.Rptr.3d 171 (2003) ……………………………………………… 9

Lomax v. Bank of America, No. 3:10-cv-48 (N.D.W.Va Aug. 18, 2010) ………. 10, 11

In Re Ekenasi, 325 F.3d 541, 544 (4th Cir. 2003) ……………………………….. 1

In re Hollis, Case No. 07-22759 (KCF) (Bankr.N.J. 9/17/2009) (Bankr.N.J., 2009) …..    5

National Bank v. Commonwealth, 9 Wall. 353, 361, 19 L.Ed. 701 (1869) …………….    9

Perez v. Midland Funding, LLC, Case No. 10-CV-01916 (LHK) (N.D. Cal. 10/19/2010) .. 9

Smith v. BAC Home Loans Servicing, Civil Action No. 2:10-cv-00354 (March 11, 2011) .. 12

Thomas V. Firestone, 164 W.Va. 763, 266 S.E.2d 905 (1980) ……………………………  4

Watters v. Wachovia, 127 S. Ct. 1559 (2007) ……………………………………………  5

White v. Wyeth, Civil Action No. 04-C-127 (W.Va., 2010) ……………………………....  4

Williams v. Mazda Motors of Am., Inc., No. 08-1314, slip op. at 5 (U.S. Fed 23, 2011) ….. 13

Wyeth v. Levine, 129 S. Ct. 1187 (2009) ………………………………………………..  5

**Statutes**                                                                                       **Page**

WEST VIRGINIA CODE § 46A-2-128 ………………………..   1, 2, 7, 8, 10, 12

WEST VIRGINIA CODE § 46A-5-103 ………………………..   8

Dodd-Frank Wall Street Reform and Consumer Protection Act ..   14

15 U.S.C. § 1692n …..……………………………………..   16

28 U.S.C. § 158(a)(1) …………………………………..   1


**Regulations**                                                                                   **Page**

12 C.F.R. § 7.4008 ………………………………………   1, 2, 6, 8, 11, 12, 15

12 C.F.R. § 34.4 ………………………………………   10, 11

12 C.F.R. § 560.2 ………………………………………..   6, 8, 9


**Other Authorities**                                                                             **Page**

Rule 8001(a) of the Federal Rules of Bankruptcy Procedure ……..................................   1

Rule 8013 of the Federal Rules of Bankruptcy Procedure ……………………………..   2

Lending and Investment, Final Rule, 61 Fed. Reg. 50951, 50966-67 (Sept. 30, 1996) …   6, 11

OTS Integration; Dodd-Frank Act Implementation, Docket ID OCC-2011-0006 ………   15

iv

## STATEMENT OF APPELLATE JURISDICTION

The District Court has jurisdiction over this case, pursuant to Bankruptcy Rule 8001(a) and 28 U.S.C. § 158(a)(1), because the Plaintiff filed a notice of appeal within 14 days of entry of a final order of the Bankruptcy Court in the same judicial district.

## STATEMENT OF THE ISSUES

1. Did the Bankruptcy Court err by finding that WV Code § 46A-2-128(e) affects a national bank's non-real estate lending powers?

2. Did the Bankruptcy Court err by not finding that WV Code § 46A-2-128(e) falls within the "criminal law" savings clause found in 12 C.F.R. § 7.4008(e)(3)?

3. Did the Bankruptcy Court err by finding that WV Code § 46A-2-128(e) does not fall into the "right to collect debts" savings clause found in 12 C.F.R. § 7.4008(e)(4)?

4. Did the Bankruptcy Court err by finding that WV Code § 46A-2-128(e)'s interference with a national bank's non-real estate lending activities is more than incidental?

5. Did the Bankruptcy Court err by deciding that WV Code § 46A-2-128(e) more than incidentally affects a national bank's lending without the benefit of expert testimony?

6. Did the Bankruptcy Court err by using the 12 C.F.R. § 7.4008 as the basis for determining preemption?

## STANDARD OF APPELLATE REVIEW

The Bankruptcy Court's findings of fact are reviewed for clear error and conclusions of law are reviewed de novo.  In Re Ekenasi, 325 F.3d 541, 544 (4th Cir. 2003).

1

On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.  Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.  Rule 8013 of the Federal Rules of Bankruptcy Procedure.

## STATEMENT OF THE CASES

### *Nature, Course, and Disposition of the Cases*

These are adversary proceedings filed by James Joseph Meluzio, Mary Kathryn Romeo, Thomas Joseph Romeo, Tina Kay Jones, and Jason Michael Jones, debtors in a chapter 7 bankruptcy, against Capital One Bank (USA), N.A., wherein they seek to recover damages for pre-petition violations of W. Va. Code § 46A-2-128(e), which prohibits a debt collector from having any communication with a consumer whenever it appears that the consumer is represented by an attorney.  Capital One filed motions to dismiss the proceedings on the basis that it is a national bank, covered by the federal National Bank Act, which preempts the Debtors' State causes of action under §46A-2-128(e).  The Bankruptcy Court, in a Memorandum Opinion entered March 7, 2011, in AP # 10-00125, found that, while §46A-2-128(e) was not expressly preempted, it does affect the national bank's non-real estate lending powers, it does not fall into the "right to collect debts" savings clause found in 12 C.F.R. § 7.4008(e)(4), and, even if it does, its interference with a national bank's non-real estate lending activities is more than incidental. For those reasons, the Court entered Orders on March 7, 2011, and March 21, 2011, which granted Capital One's motions to dismiss and dismissed the adversary complaints.

The Plaintiffs then timely filed these appeal.  Plaintiffs filed a Motion to Consolidate these cases on May 26, 2011.  On May 26, 2011, the Motion to Consolidate was granted, with 1:11-cv-00058 being designated as lead case.  Furthermore, Chief Judge John Preston Bailey transferred case to the docket of 2:11-cv-00033 to the Honorable Irene M. Keeley for all further proceedings.

### *Statement of Facts*

The facts of these cases are relatively simple and are laid out in the Debtors' complaints. James Joseph Meluzio owed Capital One three unsecured debts.  On September 17, 2010, the Debtor spoke with a Capital One representative and advised him that the Debtor had retained counsel to file for bankruptcy and gave counsel's contact information.  Throughout the month of September, the collection calls continued until he filed for bankruptcy on September 30, 2010.

Mary Kathryn Romeo and Thomas Joseph Romeo owed Capital One two unsecured debts.  In August 2010, Capital One made collection calls to the Romeos who repeatedly advised the representative that the Debtors had retained counsel to file for bankruptcy and gave counsel's contact information.  Calls continued throughout the month until August 25, 2010, when counsel's paralegal called COBUSANA to confirm representation and to request the calls to stop.

Tina Kay Jones and Jason Michael Jones owed Capital One two unsecured debts.  In June 2010, Capital One made a collection call to Mr. Jones who then gave notice to the representative that the Debtors had retained counsel and were filing for bankruptcy.  From then until July 20, 2010, Capital One made repeated collection calls to the Debtors.  On July 20, 2010, the Debtors' bankruptcy counsel called Capital One to verify his representation of the Debtors and to request that Capital One stop contacting his clients.  Counsel also followed up by sending a fax to

Capital One which confirmed his representation and instructing Capital One to cease all communications with the Debtors. Capital One continued making collection calls to the Debtors until they filed for bankruptcy.

### *Legal Framework*

Defendant, Capital One Bank (USA), N.A. (hereinafter "COBUSANA"), argues that Plaintiffs' claims of violations of the West Virginia Consumer Credit and Protection Act (hereinafter "WVCCPA") are preempted by the National Bank Act because the debt collection provisions in the WVCCPA impermissibly affect the lending of national banks like COBUSANA.

### *Vital State Interest*

The Supreme Court of Appeals in West Virginia in <u>Harless v. First Nat'l Bank</u>, 162 W.Va. 116, 246 S.E.2d 270 (1978), described the WVCCPA's manifest public policy by stating that "the Legislature intended to establish a clear and unequivocal public policy that consumers of credit covered by the Act were to be given protection." "It represents a comprehensive attempt on the part of the legislature to extend protection to the consumers and persons who obtain credit in [the] State". *Id*. The WVCCPA "was designed to protect consumers against unscrupulous collection practices, by whomever perpetrated" and has broad remedial purposes. <u>Thomas V. Firestone</u>, 164 W.Va. 763, 266 S.E.2d 905 (1980). The Supreme Court of Appeals in West Virginia in <u>White v. Wyeth</u>, Civil Action No. 04-C-127 (W.Va., 2010) recently reaffirmed that the WVCCPA is a remedial law which they must construe liberally so as to furnish and accomplish all the purposes intended.

The stated importance of this law is further supported, through code and case law (both State and federal), by the penalty of up to $1,000 and its indexing for inflation, by authorizing

awards of attorney fees and costs, by broadening the scope to include first party collectors, by awarding a penalty for each communication, by awards for merely attempting to communicate, among other things.  It seems clear that the WVCCPA promotes a vital state interest and should be given a high level of deference in any preemption analysis.

### *Presumption Against Preemption*

The United States Bankruptcy Court in New Jersey in <u>In re Hollis</u>, Case No. 07-22759 (KCF) (Bankr.N.J. 9/17/2009) (Bankr.N.J., 2009), stated that the United States Supreme Court recently reaffirmed the principle that there is a presumption against preemption, citing <u>Wyeth v. Levine</u>, 129 S. Ct. 1187 (2009).  In <u>Wyeth</u>, the Court reviewed the cornerstone of its preemption jurisprudence.  First, that Congressional purpose "is the ultimate touchstone in every preemption case," and second, that federal law is not to be found to preempt state law "unless that was the clear and manifest purpose of Congress."  The Court further cited decision of <u>Watters v. Wachovia</u>, 127 S. Ct. 1559 (2007), which said "Federally chartered banks are subject to State laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the National Bank Act."  The Court goes on to quote the eloquent dissent in <u>Watters</u>, "As early as 1870, we articulated the principle that has remained the lodestar of our jurisprudence: that national banks are only exempted from State legislation, so far as that legislation may interfere with, or impair their efficiency in performing the functions by which they are designed to serve that government.... They are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation. All their contracts are governed and construed by State laws. Their acquisition and transfer of property, their *right to collect their debts* (emphasis added), and their liability to be sued for debts, are all based on State law. It is only when the State law incapacitates the banks

from discharging their duties to the government that it becomes unconstitutional."

### *Preemption Analysis Standard*

Federal preemption may be established in three ways: (1) *express* preemption; (2) *field* preemption; and (3) *conflict* preemption.  Defendant sets forth the analysis often used in determining whether state law is preempted under a particular regulation.[1]  First, the court considers whether the state law in question is expressly preempted under the governing regulation.  If not, then the court considers whether the law affects lending and, if so, then whether it is clear that the law's effect on lending is no more than incidental.

There is no dispute that the WVCCPA is not *expressly* preempted under 12 C.F.R. § 7.4008.  No argument is made that the federal laws and regulations so completely occupy the *field* that there is no room left for state regulations.  In fact, 12 C.F.R. § 7.4008(e) specifies state laws that are not preempted.  The Court is then left with deciding whether a *conflict* between federal and state law precludes obedience to both, requiring preemption, or whether the state law no more than incidentally affect the federal lending laws, in which case preemption is not necessary.

### *Conflict Preemption*

This would lead this Court to consider the "savings clause" found in subsection (e) under 12 C.F.R. § 7.4008 titled "State laws that are not preempted".  This section states that the listed State law subjects apply to national banks to the extent that they only incidentally affect lending operations.  12 C.F.R. § 7.4008(e) specifies State laws that are not preempted, including criminal law and rights to collect debts.

---

[1] However, the analysis was outlined by the Office of Thrift Supervision ("OTS") in considering similar issues in the Home Owners' Loan Act of 1933 ("HOLA") in Lending and Investment, Final Rule, 61 Fed. Reg. 50951, 50966-67 (Sept. 30, 1996) which relates to 12 C.F.R. 560.2 which does not have a Right to Collect Debts "Savings Clause" subsection.

### ***Defendant's Proposed Void***

Creditors who collect their own debts (ie. first party collectors) are not subject to the federal Fair Debt Collection Practices Act ("FDCPA") because it only applies to outside debt collectors.  National banks, like this Defendant, as well as other Federal Savings Associations are now asking Courts to free themselves of State collection laws as well through their preemption arguments.  If they succeed, then there will be *no limits* on their collection behavior.  They would be free to do the following:

- call debtors at 2:00 in the morning;
- discuss debts with debtors' employers;
- use of obscene or profane language;
- publicize a list of consumers who refuse to pay their debts;
- advertise the sale of a debt to coerce payment;
- cause the phone to ring repeatedly with intent to annoy, abuse, or harass; and
- imply that nonpayment will result in arrest,

just to name a few.  This is yet another important factor, an absurd consequence to preempting the WVCCPA, to consider.

## ARGUMENT

### I.   WV Code § 46A-2-128(e) does not affect a national bank's non-real estate lending powers.

Without a finding of express preemption, the Court must determine how the WVCCPA more than incidentally affects lending, if at all.  As stated above, this important State law is designed to merely provide a debtor a breathing spell in the run up to a bankruptcy or other litigation.  The Bankruptcy Court noted it preserves the integrity of the attorney-client relationship, is a law of general application, and does not target national banks.  It takes a creditor little effort to flag a debtor's account to shut down communications except with his/her attorney until other legal remedies can be pursued.  Creditors have the ability to shut down

account activity and already have procedures in place for similar situations, like the filing of a bankruptcy.  These debt collection method protections only typically arise in the final stages of an account; all well after the *lending* process.  As such, it is not an essential part of lending.

## II.     WV Code § 46A-2-128(e) falls within the "criminal law" savings clause found in 12 C.F.R. § 7.4008(e)(3).

12 C.F.R. § 7.4008(e) specifically states that State criminal laws are not preempted.  The WVCCPA, under § 46A-5-103(4), states that any person who willfully violates § 46A-2-128 shall be *guilty of a misdemeanor* and, upon conviction thereof, shall be fined not more than one thousand dollars, or imprisoned in the county jail not more than one year, or both fined and imprisoned.  Because Defendant is alleged to have violated 46A-2-128 by calling the Plaintiff after the Defendant was aware that the Plaintiff was represented by an attorney, the Defendant could be found guilty of a misdemeanor.  As such, §128 of the WVCCPA is specifically *not* preempted.

## III.    WV Code § 46A-2-128(e) falls within the "right to collect debts" savings clause found in 12 C.F.R. § 7.4008(e)(4).

The Northern District Court of California in Alkan v. Citimortgage, Inc., 336 F.Supp.2d 1061 (N.D. Cal., 2004), decided a case similar to Aguayo v. United States Bank, 658 F. Supp. 2d 1226, discussed later, and the case at hand.  It involved claims against a National Bank who argued that the California Fair Debt Collection Practices Act ("CFDCPA") was preempted.  The Defendant bank contended that the CFDCPA is a lending regulation, and thus preempted by Regulation § 560.2(a).  The Defendant argued that debt collection is an essential part of lending practices, meaning any limitations on debt collection constitute a lending regulation.  However,

8

the Alkan Court determined, after a comparison of the examples of lending regulations enumerated in Regulation § 560.2(b) and the provisions of the CFDCPA, that the defendant's position was incorrect.  The Court noted that the lending regulations deal with laws affecting the terms of the loan, the rate of interest, the type or amount of security required, any loan-related fees, escrow account requirements, and processing or servicing issues.  The CFDCPA regulates the permissible practices for attempting to collect a debt once the loan has been made.  It goes on to say that a California court found the similar California Consumer Credit Reporting Agencies Act was not preempted by Regulation § 560.2(a) because "[t]he California statutory scheme does not come into play until after a loan is made or credit otherwise extended, and it does not affect the manner in which the lender services or maintains the loan," citing  Hussey-Head v. World Savings & Loan Assn., 111 Cal.App.4th 773, 782, 4 Cal.Rptr.3d 171 (2003).  In the end, the Court found that the same is true for the CFDCPA, and for that reason, it did not constitute a lending regulation and the plaintiff's claims were not preempted.

The California Second District Court of Appeal in Hood v. Santa Barbara Bank & Trust, 49 Cal.Rptr.3d 369, 143 Cal.App.4th 526 (Cal. App., 2006), ruled in line with Alkan, finding that California's debt collection law does not have more than an incidental effect on banks.

The Northern District of California reaffirmed the logic behind the Alkan decision in Perez v. Midland Funding, LLC, Case No. 10-CV-01916 (LHK) (N.D. Cal. 10/19/2010).  The Perez Court relied in part on the Supreme Court case, Atherton v. Federal Deposit Insurance Corporation, 519 U.S. 213 (1997), and stated that *lending* is at the heart of banking regulations, while debt collection is a separate matter of State concern that has long been governed by State law.

In Atherton, the Court quotes National Bank v. Commonwealth, 9 Wall. 353, 361, 19

L.Ed. 701 (1869), stating "federal banks are subject to the laws of the State.  All their contracts are governed and construed by State laws.  Their acquisition and transfer of property, their *right to collect their debts* (emphasis added), and their liability to be sued for debts, are all based on State law.  It is only when the State law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional."

The WVCCPA is a debt collection law, much like the CFDCPA, and falls squarely within the right to collect debts savings clause.

**IV.    WV Code § 46A-2-128(e)'s interference with a national bank's non-real estate lending activities is no more than incidental.**

As stated above, the State's debt collection method protections only typically arise in the final stages of an account; all well after the *lending* process.  As such, it is not an essential part of lending.  And if it is not an essential part of the lending process, then it cannot more than incidentally affect lending.

Defendant argues that the WVCCPA more than incidentally affects lending because it restricts its ability to collect on debt that is lent.  In support of this argument, Defendant relies heavily on <u>Lomax v. Bank of America</u>, No. 3:10-cv-48 (N.D.W.Va Aug. 18, 2010), <u>Frye v. Bank of America</u>, No. 3:10-cv-47 (N.D.W.Va Aug. 16, 2010), and <u>Aguayo v. United States Bank</u>, 658 F. Supp. 2d 1226.

However, the holdings in <u>Lomax</u> and <u>Frye</u>, also relied upon by the Bankruptcy Court, are distinguishable from this case in that those cases involved mortgages which are regulated under 12 C.F.R. § 34.4 and the Plaintiff respectfully disagrees that these cases control the decision in this case.   The Court in both <u>Lomax</u> and <u>Frye</u> found that the WVCCPA was *expressly* preempted

because it restricts communications regarding mortgage loans and based its findings upon 12 C.F.R. § 34.4(a)(10).[2]  Under the applicable regulations in this case, found in 12 C.F.R. § 7.4008, there is no equivalent provision under subsection (d) which makes this case *expressly* preempted. With such a finding, the presumption analysis properly ends there.[3]  Any subsequent finding, the Plaintiff argues, is merely dicta and not controlling as it was based upon regulations dealing with real estate lending.  It appears as though this alternate finding was merely in response to the Plaintiff's attempt to bootstrap the state law claim to the equivalent federal law.  Without a corresponding applicable regulation in this case, this Court is not bound by those decisions.

The Atherton Court answered the question of whether federal law (regarding the appropriate gross negligence standard) supplants the State law's standard of care.  It answered that the State law sets the standard of conduct for federal banks as long as the State standard is stricter than that of the federal statute.  This rationale appears to be in opposite to the alternate holding in Lomax and Frye that the WVCCPA was preempted merely because it is stricter than the FDCPA.

The decision in Aguayo is also distinguishable from this case because the Court found that 12 C.F.R. § 7.4008(d)(2)(viii) *expressly* preempted the State law disclosure requirement at issue.  No argument has been made that 12 C.F.R. § 7.4008(d)(2)(viii) is relevant to this case, nor any other part of (d) for that matter.  Also, it should be noted that Aguayo is on appeal before the Ninth Circuit and oral arguments were heard on February 9, 2011.  (See Ninth Circuit Court of Appeals Docket #09-56679).

---

[2] The Court alternatively found that the WVCCPA could not use the federal Fair Debt Collection Practices Act ("FDCPA") claim to avoid preemption because the state law was more restrictive than the FDCPA.
[3] According to Lending and Investment, Final Rule, 61 Fed. Reg. 50951, 50966-67 (Sept. 30, 1996).

As the WVCCPA concerns both criminal law and the creditor's right to collect debt savings clauses and no more than incidentally affects lending activities, it should not be preempted.

## V.     Expert testimony is required to properly determine the true extent of WV Code § 46A-2-128(e)'s effect on a national bank's lending.

An important issue is whether the restrictions that State law places upon creditors on the manner in which they collect their debts more than incidentally affects lending.  Testimony from an expert in the field of national banking would be necessary to properly determine how the State law restriction affects lending, if at all.

## VI.    12 C.F.R. § 7.4008 is not the proper basis for determining preemption.

Chief Judge Joseph R. Goodwin from the United States District Court in the Southern District of West Virginia took a rather novel and foresighted approach to deciding whether a State law is preempted by the National Bank Act in an opinion published March 11, 2011, in Smith v. BAC Home Loans Servicing, Civil Action No. 2:10-cv-00354.  In Smith v. BAC, the plaintiff filed a three count lawsuit, one of which alleged violations of § 46A-2-128 the WVCCPA, against BAC, a national bank.  BAC filed a Motion for Summary Judgment, arguing that the WVCCPA is preempted by both the National Bank Act and regulations promulgated by the Office of the Comptroller of the Currency (hereinafter "OCC").

Chief Judge Goodwin begins his analysis by stating the two cornerstones of preemption jurisprudence.  First, Congressional intent is key and can be demonstrated by the text, structure, and purpose of the statute.  Second, the historic police powers of the States were not to be

superseded by federal law unless that was the clear and manifest purpose of Congress.  He notes the presumption against preemption is especially strong where preemption is applied to fields traditionally occupied by the States, such as consumer-protection statutes like the WVCCPA, and the presumption should be even stronger when no federal remedy exists.

He set forth the three main types of preemption (express, field, and conflict) and then listed two subcategories of conflict preemption; direct and "obstacle" preemption.  He notes the parameters of obstacle preemption were recently refined by the US Supreme Court in Williams v. Mazda Motors of Am., Inc., No. 08-1314, slip op. at 5 (U.S. Fed 23, 2011), wherein the Court emphasized that it is essential to show that a significant objective of a federal regulation be identified.  The Court found that the federal policy choice did not represent a significant regulatory objective of Congress and, therefore, the State tort claim, even with the potential to constrict that choice, did not stand as an obstacle to the accomplishment of the full purpose and objectives of the federal law and was not preempted.

Judge Goodwin then notes that the NBA contains no express preemption provision and, while the OCC was granted broad rulemaking authority, no statute specifically gives the OCC preemption authority.  The regulations promulgated have always simply been the OCC's attempt to distill existing principals of conflict preemption precedent.

From this standpoint, Judge Goodwin was left to decide whether the WVCCPA was preempted by obstacle preemption because it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  By finding no text or inherent purpose of the NBA that demonstrates Congress' intent to displace State consumer protection laws of general applicability, like the WVCCPA, the Court concluded that the State law claims were not preempted.

Likewise, this Court should analyze the potential preemption of the WVCCPA under this analysis of case law as opposed to the proposed regulatory authority.

Further supporting this analytical framework is the Dodd-Frank Wall Street Reform and Consumer Protection Act, H.R. 4173, (hereinafter "Dodd-Frank") which was signed into law on July 21, 2010, and is to become effective July 21, 2011.  Title X – Bureau of Consumer Financial Protection of Dodd-Frank is known as the Consumer Financial Protection Act of 2010.  Subtitle D – Preservation of State Law, § 1041(a)(2) establishes general protection of any State laws if the protection it affords consumers is greater than the protection provided under Title X.

§ 1044 of Dodd-Frank amends the Code by inserting a new section (§ 5136C - State Law Preemption Standards For National Banks and Subsidiaries Clarified) which clarifies the proper State law preemption standards for National Banks.  It sets forth that "State consumer financial laws"[4] are preempted only if one of three criteria are met:

(1)    the State consumer financial law has a discriminatory effect on national banks, compared to the effect of a State chartered bank;

(2)    the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers (thereby specifically codifying the legal preemption standard established by the Supreme Court of the United States in Barnett Bank of Marion Cnty., N.A. v. Nelson, 517 U.S. 25 (1996)); or

(3)    the State consumer financial law is preempted by a provision of another Federal law.

---

[4] The term 'State consumer financial law' means a State law that does not directly or indirectly discriminate against national banks and that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer. *See* new § 5136C(a)(2).

In response, the OCC issued a notice of proposed rulemaking on May 25, 2011, to be published in the *Federal Register* on May 26, 2011, which proposes to amend its regulations. *See* OTS Integration; Dodd-Frank Act Implementation, Docket ID OCC-2011-0006.  In particular, the OCC proposes to amend 12 C.F.R. § 7.4008 by removing paragraph (d)(1) which says "state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized non-real estate lending powers are not applicable to national banks." Paragraph (e) will be revised to read, "State laws that are not preempted. State laws on the following subjects are not inconsistent with the non-real estate lending powers of national banks and apply to national banks to the extent consistent with the decision of the Supreme Court in Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al., 517 U.S. 25 (1996)." And paragraph (e)(8) will now read, "Any other law that the OCC determines to be applicable to national banks in accordance with the decision of the Supreme Court in Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al., 517 U.S. 25 (1996) or that is made applicable by Federal law."

As the WVCCPA is a law of general application and applies equally to national banks, federal savings associations, State chartered banks, collection agencies, and the like, it cannot be said to discriminate against national lenders.

It is clear that the WVCCPA does not prevent national banks from exercising their powers.  Nor does it significantly interfere with national banks' powers.  In Barnett, Florida's State law, which prohibited national banks from selling insurance in small towns, was found to be preempted because federal law gave national banks the power to sell insurance.  The Court found that the State law stood as an obstacle to the accomplishment of the federal statute's purpose; ie. there was an irreconcilable conflict between the two laws.

15

Here, there is no federal law which gives national lenders the power to contact debtors who have retained counsel, which would lead to a direct conflict.  The National Bank Act's purpose is to shield national banks from unduly burdensome and duplicative State regulation. The WVCCPA's restriction on contacting a debtor is not unduly burdensome and is not duplicative of federal regulation.  Therefore, it in no way interferes with the NBA's purpose.

Finally, the WVCCPA is not expressly preempted by any other provision of Federal law. In fact, in its federal counterpart, the Fair Debt Collection Practices Act, Congress expressly preserves stronger state debt-collection laws.[5]

## **CONCLUSION**

In sum, the Plaintiffs argue that the WVCCPA is not preempted because there is no express preemption, Congress did not intend to preempt all State banking laws by occupying the entire field, the State debt collection laws are expressly permitted by the regulation's savings clause, the State and federal laws do not conflict to the extent that both cannot be obeyed, State laws no more than incidentally affect lending, if at all, and expert testimony is required to properly determine to what extent the law has on lending.

**WHEREFORE**, the Plaintiffs respectfully pray that this Court:

A.     Reverse the Bankruptcy Court's opinion;

B.     Remand the cases for further proceedings; and

C.     Award Plaintiffs such other and further relief as may be just and proper.

Dated: June 1, 2011

---

[5] This subchapter does not annul, alter, or affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency. For purposes of this section, a State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection provided by this subchapter. *See* 15 U.S.C. § 1692n.

Respectfully submitted,

**JAMES JOSEPH MELUZIO,**
**MARY KATHRYN ROMEO,**
**THOMAS JOSEPH ROMEO,**
**TINA KAY JONES, and**
**JASON MICHAEL JONES**

By counsel

/s/ Todd B. Johnson
Attorney for Plaintiffs/Debtors/Appellants
Todd B. Johnson (WV State Bar No. 9261)
Johnson Law, PLLC
PO Box 519
Morgantown, WV  26507
(304) 292-7933 phone

**CERTIFICATE OF SERVICE**

I, Todd B. Johnson, counsel for Plaintiffs, do hereby certify that on June 1, 2011, I served
APPELLANTS' COMBINED BRIEF ON APPEAL on the following by CM/ECF and email:

Bruce Michael Jacobs on behalf of Defendant Capital One Bank (USA), N.A.
bjacobs@spilmanlaw.com

/s/ Todd B. Johnson
Attorney for Plaintiffs/Debtors/Appellants
Todd B. Johnson (WV State Bar No. 9261)
Johnson Law, PLLC
PO Box 519
Morgantown, WV  26507
(304) 292-7933 phone

## ADDENDUM

WEST VIRGINIA CODE § 46A-2-128

WEST VIRGINIA CODE § 46A-5-103

12 C.F.R. § 7.4008

12 C.F.R. § 34.4

12 C.F.R. § 560.2

Dodd-Frank Wall Street Reform and Consumer Protection Act, H.R. 4173 (excerpts)

OTS Integration; Dodd-Frank Act Implementation, Docket ID OCC-2011-0006 (excerpts)

**WEST VIRGINIA CODE §46A-2-128.** Unfair or unconscionable means.

No debt collector shall use unfair or unconscionable means to collect or attempt to collect any claim. Without limiting the general application of the foregoing, the following conduct is deemed to violate this section:

(a) The seeking or obtaining of any written statement or acknowledgment in any form that specifies that a consumer's obligation is one incurred for necessaries of life where the original obligation was not in fact incurred for such necessaries;

(b) The seeking or obtaining of any written statement or acknowledgment in any form containing an affirmation of any obligation by a consumer who has been declared bankrupt, without clearly disclosing the nature and consequences of such affirmation and the fact that the consumer is not legally obligated to make such affirmation;

(c) The collection or the attempt to collect from the consumer all or any part of the debt collector's fee or charge for services rendered: Provided, That attorney's fees, court costs and other reasonable collection costs and charges necessary for the collection of any amount due upon delinquent educational loans made by any institution of higher education within this state may be recovered when the terms of the obligation so provide. Recovery of attorney's fees and collection costs may not exceed thirty-three and one-third percent of the amount due and owing to any such institution: Provided, however, That nothing contained in this subsection shall be construed to limit or prohibit any institution of higher education from paying additional attorney fees and collection costs as long as such additional attorney fees and collection costs do not exceed an amount equal to five percent of the amount of the debt actually recovered and such additional attorney fees and collection costs are deducted or paid from the amount of the debt recovered for the institution or paid from other funds available to the institution;

(d) The collection of or the attempt to collect any interest or other charge, fee or expense incidental to the principal obligation unless such interest or incidental fee, charge or expense is expressly authorized by the agreement creating the obligation and by statute; and

(e) Any communication with a consumer whenever it appears that the consumer is represented by an attorney and the attorney's name and address are known, or could be easily ascertained, unless the attorney fails to answer correspondence, return phone calls or discuss the obligation in question or unless the attorney consents to direct communication.

**WEST VIRGINIA CODE §46A-5-103.** Willful violations.

(1) A regulated consumer lender who willfully makes charges in excess of those permitted by the provisions of article four of this chapter, pertaining to regulated consumer lenders, shall be guilty of a misdemeanor and, upon conviction, shall be fined not more than five thousand dollars, or imprisoned not more than one year, or both fined and imprisoned.

(2) A person who willfully engages in the business of making regulated consumer loans without a license in violation of the provisions of article four of this chapter applying to authority to make regulated consumer loans shall be guilty of a misdemeanor and, upon conviction, shall be fined not more than five thousand dollars, or imprisoned not more than one year, or both fined and imprisoned.

(3) A person who willfully engages in the business of making consumer credit sales or consumer loans, or of taking assignments of rights against consumers arising therefrom and undertakes direct collection of payments or enforcement of these rights, without complying with the provisions of section one hundred fifteen, article seven of this chapter, concerning notification, shall be guilty of a misdemeanor and, upon conviction, shall be fined not more than one hundred dollars.

(4) Any person who willfully violates any of the provisions of sections one hundred twenty-three through one hundred twenty-eight, inclusive, article two of this chapter, by committing any of the specifically described and enumerated acts contained therein, shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than one thousand dollars, or imprisoned in the county jail not more than one year, or both fined and imprisoned.

**12 C.F.R. § 7.4008**  Lending.
Title 12: Banks and Banking
PART 7—BANK ACTIVITIES AND OPERATIONS
Subpart D—Preemption
§ 7.4008  Lending.
(a) *Authority of national banks.* A national bank may make, sell, purchase, participate in, or otherwise deal in loans and interests in loans that are not secured by liens on, or interests in, real estate, subject to such terms, conditions, and limitations prescribed by the Comptroller of the Currency and any other applicable Federal law.
(b) *Standards for loans.* A national bank shall not make a consumer loan subject to this §7.4008 based predominantly on the bank's realization of the foreclosure or liquidation value of the borrower's collateral, without regard to the borrower's ability to repay the loan according to its terms. A bank may use any reasonable method to determine a borrower's ability to repay, including, for example, the borrower's current and expected income, current and expected cash flows, net worth, other relevant financial resources, current financial obligations, employment status, credit history, or other relevant factors.
(c) *Unfair and deceptive practices.* A national bank shall not engage in unfair or deceptive practices within the meaning of section 5 of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), and regulations promulgated thereunder in connection with loans made under this §7.4008.
(d) *Applicability of state law.* (1) Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized non-real estate lending powers are not applicable to national banks.
(2) A national bank may make non-real estate loans without regard to state law limitations concerning:
(i) Licensing, registration (except for purposes of service of process), filings, or reports by creditors;
(ii) The ability of a creditor to require or obtain insurance for collateral or other credit enhancements or risk mitigants, in furtherance of safe and sound banking practices;
(iii) Loan-to-value ratios;
(iv) The terms of credit, including the schedule for repayment of principal and interest, amortization of loans, balance, payments due, minimum payments, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;
(v) Escrow accounts, impound accounts, and similar accounts;
(vi) Security property, including leaseholds;
(vii) Access to, and use of, credit reports;
(viii) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents;
(ix) Disbursements and repayments; and
(x) Rates of interest on loans.[6]
[6] The limitations on charges that comprise rates of interest on loans by national banks are determined under Federal law. *See* 12 U.S.C. 85; 12 CFR 7.4001. State laws purporting to regulate national bank fees and charges that do not constitute interest are addressed in 12 CFR 7.4002.
(e) *State laws that are not preempted.* State laws on the following subjects are not inconsistent with the non-real estate lending powers of national banks and apply to national banks to the

21

extent that they only incidentally affect the exercise of national banks' non-real estate lending powers:

(1) Contracts;

(2) Torts;

(3) Criminal law;[7]

[7] *See supra* note 5 regarding the distinction drawn by the Supreme Court in *Easton* v. *Iowa,* 188 U.S. 220, 238 (1903) between "crimes defined and punishable at common law or by the general statutes of a state and crimes and offences cognizable under the authority of the United States."

(4) Rights to collect debts;

(5) Acquisition and transfer of property;

(6) Taxation;

(7) Zoning; and

(8) Any other law the effect of which the OCC determines to be incidental to the non-real estate lending operations of national banks or otherwise consistent with the powers set out in paragraph (a) of this section.

**12 C.F.R. § 34.4**   Applicability of state law.

Title 12 - Banks and Banking

PART 34—REAL ESTATE LENDING AND APPRAISALS

Subpart A—General

§ 34.4   Applicability of state law.

(a) Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks. Specifically, a national bank may make real estate loans under 12 U.S.C. 371 and §34.3, without regard to state law limitations concerning:

(1) Licensing, registration (except for purposes of service of process), filings, or reports by creditors;

(2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements or risk mitigants, in furtherance of safe and sound banking practices;

(3) Loan-to-value ratios;

(4) The terms of credit, including schedule for repayment of principal and interest, amortization of loans, balance, payments due, minimum payments, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;

(5) The aggregate amount of funds that may be loaned upon the security of real estate;

(6) Escrow accounts, impound accounts, and similar accounts;

(7) Security property, including leaseholds;

(8) Access to, and use of, credit reports;

(9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents;

(10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;

(11) Disbursements and repayments;

(12) Rates of interest on loans;[1]

[1] The limitations on charges that comprise rates of interest on loans by national banks are determined under Federal law. *See* 12 U.S.C. 85 and 1735f–7a; 12 CFR 7.4001. State laws purporting to regulate national bank fees and charges that do not constitute interest are addressed in 12 CFR 7.4002.

(13) Due-on-sale clauses except to the extent provided in 12 U.S.C. 1701j–3 and 12 CFR part 591; and

(14) Covenants and restrictions that must be contained in a lease to qualify the leasehold as acceptable security for a real estate loan.

(b) State laws on the following subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' real estate lending powers:

(1) Contracts;

(2) Torts;

(3) Criminal law; [2]

[2] *But see* the distinction drawn by the Supreme Court in *Easton* v. *Iowa,* 188 U.S. 220, 238 (1903) between "crimes defined and punishable at common law or by the general statutes of a state and crimes and offences cognizable under the authority of the United States." The Court stated that "[u]ndoubtedly a state has the legitimate power to define and punish crimes by general laws applicable to all persons within

its jurisdiction  *  *  *. But it is without lawful power to make such special laws applicable to banks organized and operating under the laws of the United States." *Id.* at 239 (holding that Federal law governing the operations of national banks preempted a state criminal law prohibiting insolvent banks from accepting deposits).

(4) Homestead laws specified in 12 U.S.C. 1462a(f);

(5) Rights to collect debts;

(6) Acquisition and transfer of real property;

(7) Taxation;

(8) Zoning; and

(9) Any other law the effect of which the OCC determines to be incidental to the real estate lending operations of national banks or otherwise consistent with the powers and purposes set out in §34.3(a).

**12 C.F.R. § 560.2**   Applicability of law.

(a) *Occupation of field.* Pursuant to sections 4(a) and 5(a) of the HOLA, 12 U.S.C. 1463(a), 1464(a), OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA. To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulation for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section or §560.110 of this part. For purposes of this section, "state law" includes any state statute, regulation, ruling, order or judicial decision.

(b) *Illustrative examples.* Except as provided in §560.110 of this part, the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding:

(1) Licensing, registration, filings, or reports by creditors;

(2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements;

(3) Loan-to-value ratios;

(4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;

(5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;

(6) Escrow accounts, impound accounts, and similar accounts;

(7) Security property, including leaseholds;

(8) Access to and use of credit reports;

(9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;

(10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;

(11) Disbursements and repayments;

(12) Usury and interest rate ceilings to the extent provided in 12 U.S.C. 1735f–7a and part 590 of this chapter and 12 U.S.C. 1463(g) and §560.110 of this part; and

(13) Due-on-sale clauses to the extent provided in 12 U.S.C. 1701j–3 and part 591 of this chapter.

(c) *State laws that are not preempted.* State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section:

25

(1) Contract and commercial law;

(2) Real property law;

(3) Homestead laws specified in 12 U.S.C. 1462a(f);

(4) Tort law;

(5) Criminal law; and

(6) Any other law that OTS, upon review, finds:

(i) Furthers a vital state interest; and

(ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section.

H. R. 4173

# One Hundred Eleventh Congress
## of the
## United States of America

### AT THE SECOND SESSION

*Begun and held at the City of Washington on Tuesday,*
*the fifth day of January, two thousand and ten*

## An Act

To promote the financial stability of the United States by improving accountability
and transparency in the financial system, to end "too big to fail", to protect
the American taxpayer by ending bailouts, to protect consumers from abusive
financial services practices, and for other purposes.

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Dodd-Frank
Wall Street Reform and Consumer Protection Act".

(b) TABLE OF CONTENTS.—The table of contents for this Act
is as follows:

Sec. 1.  Short title; table of contents.
Sec. 2.  Definitions.
Sec. 3.  Severability.
Sec. 4.  Effective date.
Sec. 5.  Budgetary effects.
Sec. 6.  Antitrust savings clause.

TITLE I—FINANCIAL STABILITY

Sec. 101.  Short title.
Sec. 102.  Definitions.

Subtitle A—Financial Stability Oversight Council

Sec. 111.  Financial Stability Oversight Council established.
Sec. 112.  Council authority.
Sec. 113.  Authority to require supervision and regulation of certain nonbank finan-
           cial companies.
Sec. 114.  Registration of nonbank financial companies supervised by the Board of
           Governors.
Sec. 115.  Enhanced supervision and prudential standards for nonbank financial
           companies supervised by the Board of Governors and certain bank hold-
           ing companies.
Sec. 116.  Reports.
Sec. 117.  Treatment of certain companies that cease to be bank holding companies.
Sec. 118.  Council funding.
Sec. 119.  Resolution of supervisory jurisdictional disputes among member agencies.
Sec. 120.  Additional standards applicable to activities or practices for financial sta-
           bility purposes.
Sec. 121.  Mitigation of risks to financial stability.
Sec. 122.  GAO Audit of Council.
Sec. 123.  Study of the effects of size and complexity of financial institutions on cap-
           ital market efficiency and economic growth.

Subtitle B—Office of Financial Research

Sec. 151.  Definitions.
Sec. 152.  Office of Financial Research established.
Sec. 153.  Purpose and duties of the Office.
Sec. 154.  Organizational structure; responsibilities of primary programmatic units.
Sec. 155.  Funding.
Sec. 156.  Transition oversight.

H. R. 4173—8

Sec. 987. Amendment to definition of material loss and nonmaterial losses to the
         Deposit Insurance Fund for purposes of Inspector General reviews.
Sec. 988. Amendment to definition of material loss and nonmaterial losses to the
         National Credit Union Share Insurance Fund for purposes of Inspector
         General reviews.
Sec. 989. Government Accountability Office study on proprietary trading.
Sec. 989A. Senior investor protections.
Sec. 989B. Designated Federal entity inspectors general independence.
Sec. 989C. Strengthening Inspector General accountability.
Sec. 989D. Removal of Inspectors General of designated Federal entities.
Sec. 989E. Additional oversight of financial regulatory system.
Sec. 989F. GAO study of person to person lending.
Sec. 989G. Exemption for nonaccelerated filers.
Sec. 989H. Corrective responses by heads of certain establishments to deficiencies
         identified by Inspectors General.
Sec. 989I. GAO study regarding exemption for smaller issuers.
Sec. 989J. Further promoting the adoption of the NAIC Model Regulations that en-
         hance protection of seniors and other consumers.

         Subtitle J—Securities and Exchange Commission Match Funding
Sec. 991. Securities and Exchange Commission match funding.

         TITLE X—BUREAU OF CONSUMER FINANCIAL PROTECTION
Sec. 1001. Short title.
Sec. 1002. Definitions.

         Subtitle A—Bureau of Consumer Financial Protection
Sec. 1011. Establishment of the Bureau of Consumer Financial Protection.
Sec. 1012. Executive and administrative powers.
Sec. 1013. Administration.
Sec. 1014. Consumer Advisory Board.
Sec. 1015. Coordination.
Sec. 1016. Appearances before and reports to Congress.
Sec. 1017. Funding; penalties and fines.
Sec. 1018. Effective date.

         Subtitle B—General Powers of the Bureau
Sec. 1021. Purpose, objectives, and functions.
Sec. 1022. Rulemaking authority.
Sec. 1023. Review of Bureau regulations.
Sec. 1024. Supervision of nondepository covered persons.
Sec. 1025. Supervision of very large banks, savings associations, and credit unions.
Sec. 1026. Other banks, savings associations, and credit unions.
Sec. 1027. Limitations on authorities of the Bureau; preservation of authorities.
Sec. 1028. Authority to restrict mandatory pre-dispute arbitration.
Sec. 1029. Exclusion for auto dealers.
Sec. 1029A. Effective date.

         Subtitle C—Specific Bureau Authorities
Sec. 1031. Prohibiting unfair, deceptive, or abusive acts or practices.
Sec. 1032. Disclosures.
Sec. 1033. Consumer rights to access information.
Sec. 1034. Response to consumer complaints and inquiries.
Sec. 1035. Private education loan ombudsman.
Sec. 1036. Prohibited acts.
Sec. 1037. Effective date.

         Subtitle D—Preservation of State Law
Sec. 1041. Relation to State law.
Sec. 1042. Preservation of enforcement powers of States.
Sec. 1043. Preservation of existing contracts.
Sec. 1044. State law preemption standards for national banks and subsidiaries
         clarified.
Sec. 1045. Clarification of law applicable to nondepository institution subsidiaries.
Sec. 1046. State law preemption standards for Federal savings associations and
         subsidiaries clarified.
Sec. 1047. Visitorial standards for national banks and savings associations.
Sec. 1048. Effective date.

         Subtitle E—Enforcement Powers
Sec. 1051. Definitions.

H. R. 4173—580

(15 U.S.C. 80a-24(f)) shall be deposited into the Reserve Fund.

"(B) LIMITATIONS.—For any 1 fiscal year—

"(i) the amount deposited in the Fund may not exceed $50,000,000; and

"(ii) the balance in the Fund may not exceed $100,000,000.

"(C) EXCESS FEES.—Any amounts in excess of the limitations described in subparagraph (B) that the Commission collects from registration fees under section 6(b) of the Securities Act of 1933 (15 U.S.C. 77f(b)) or section 24(f) of the Investment Company Act of 1940 (15 U.S.C. 80a-24(f)) shall be deposited in the General Fund of the Treasury of the United States and shall not be available for obligation by the Commission.

"(3) USE OF AMOUNTS IN RESERVE FUND.—The Commission may obligate amounts in the Reserve Fund, not to exceed a total of $100,000,000 in any 1 fiscal year, as the Commission determines is necessary to carry out the functions of the Commission. Any amounts in the reserve fund shall remain available until expended. Not later than 10 days after the date on which the Commission obligates amounts under this paragraph, the Commission shall notify Congress of the date, amount, and purpose of the obligation.

"(4) RULE OF CONSTRUCTION.—Amounts collected and deposited in the Reserve Fund shall not be construed to be Government funds or appropriated monies and shall not be subject to apportionment for the purpose of chapter 15 of title 31, United States Code, or under any other authority.".

(2) EFFECTIVE DATE.—The amendment made by this subsection shall take effect on October 1, 2011.

# TITLE X—BUREAU OF CONSUMER FINANCIAL PROTECTION

**SEC. 1001. SHORT TITLE.**

This title may be cited as the "Consumer Financial Protection Act of 2010".

**SEC. 1002. DEFINITIONS.**

Except as otherwise provided in this title, for purposes of this title, the following definitions shall apply:

(1) AFFILIATE.—The term "affiliate" means any person that controls, is controlled by, or is under common control with another person.

(2) BUREAU.—The term "Bureau" means the Bureau of Consumer Financial Protection.

(3) BUSINESS OF INSURANCE.—The term "business of insurance" means the writing of insurance or the reinsuring of risks by an insurer, including all acts necessary to such writing or reinsuring and the activities relating to the writing of insurance or the reinsuring of risks conducted by persons who act as, or are, officers, directors, agents, or employees of insurers or who are other persons authorized to act on behalf of such persons.

H. R. 4173—581

(4) CONSUMER.—The term "consumer" means an individual or an agent, trustee, or representative acting on behalf of an individual.

(5) CONSUMER FINANCIAL PRODUCT OR SERVICE.—The term "consumer financial product or service" means any financial product or service that is described in one or more categories under—

(A) paragraph (15) and is offered or provided for use by consumers primarily for personal, family, or household purposes; or

(B) clause (i), (iii), (ix), or (x) of paragraph (15)(A), and is delivered, offered, or provided in connection with a consumer financial product or service referred to in subparagraph (A).

(6) COVERED PERSON.—The term "covered person" means—

(A) any person that engages in offering or providing a consumer financial product or service; and

(B) any affiliate of a person described in subparagraph (A) if such affiliate acts as a service provider to such person.

(7) CREDIT.—The term "credit" means the right granted by a person to a consumer to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase.

(8) DEPOSIT-TAKING ACTIVITY.—The term "deposit-taking activity" means—

(A) the acceptance of deposits, maintenance of deposit accounts, or the provision of services related to the acceptance of deposits or the maintenance of deposit accounts;

(B) the acceptance of funds, the provision of other services related to the acceptance of funds, or the maintenance of member share accounts by a credit union; or

(C) the receipt of funds or the equivalent thereof, as the Bureau may determine by rule or order, received or held by a covered person (or an agent for a covered person) for the purpose of facilitating a payment or transferring funds or value of funds between a consumer and a third party.

(9) DESIGNATED TRANSFER DATE.—The term "designated transfer date" means the date established under section 1062.

(10) DIRECTOR.—The term "Director" means the Director of the Bureau.

(11) ELECTRONIC CONDUIT SERVICES.—The term "electronic conduit services"—

(A) means the provision, by a person, of electronic data transmission, routing, intermediate or transient storage, or connections to a telecommunications system or network; and

(B) does not include a person that provides electronic conduit services if, when providing such services, the person—

(i) selects or modifies the content of the electronic data;

(ii) transmits, routes, stores, or provides connections for electronic data, including financial data, in a manner that such financial data is differentiated from other types of data of the same form that such

H. R. 4173—582

person transmits, routes, or stores, or with respect
to which, provides connections; or

(iii) is a payee, payor, correspondent, or similar
party to a payment transaction with a consumer.

(12) ENUMERATED CONSUMER LAWS.—Except as otherwise
specifically provided in section 1029, subtitle G or subtitle
H, the term "enumerated consumer laws" means—

(A) the Alternative Mortgage Transaction Parity Act
of 1982 (12 U.S.C. 3801 et seq.);

(B) the Consumer Leasing Act of 1976 (15 U.S.C. 1667
et seq.);

(C) the Electronic Fund Transfer Act (15 U.S.C. 1693
et seq.), except with respect to section 920 of that Act;

(D) the Equal Credit Opportunity Act (15 U.S.C. 1691
et seq.);

(E) the Fair Credit Billing Act (15 U.S.C. 1666 et
seq.);

(F) the Fair Credit Reporting Act (15 U.S.C. 1681
et seq.), except with respect to sections 615(e) and 628
of that Act (15 U.S.C. 1681m(e), 1681w);

(G) the Home Owners Protection Act of 1998 (12 U.S.C.
4901 et seq.);

(H) the Fair Debt Collection Practices Act (15 U.S.C.
1692 et seq.);

(I) subsections (b) through (f) of section 43 of the Fed-
eral Deposit Insurance Act (12 U.S.C. 1831t(c)–(f));

(J) sections 502 through 509 of the Gramm-Leach-
Bliley Act (15 U.S.C. 6802–6809) except for section 505
as it applies to section 501(b);

(K) the Home Mortgage Disclosure Act of 1975 (12
U.S.C. 2801 et seq.);

(L) the Home Ownership and Equity Protection Act
of 1994 (15 U.S.C. 1601 note);

(M) the Real Estate Settlement Procedures Act of 1974
(12 U.S.C. 2601 et seq.);

(N) the S.A.F.E. Mortgage Licensing Act of 2008 (12
U.S.C. 5101 et seq.);

(O) the Truth in Lending Act (15 U.S.C. 1601 et seq.);

(P) the Truth in Savings Act (12 U.S.C. 4301 et seq.);

(Q) section 626 of the Omnibus Appropriations Act,
2009 (Public Law 111–8); and

(R) the Interstate Land Sales Full Disclosure Act (15
U.S.C. 1701).

(13) FAIR LENDING.—The term "fair lending" means fair,
equitable, and nondiscriminatory access to credit for consumers.

(14) FEDERAL CONSUMER FINANCIAL LAW.—The term "Fed-
eral consumer financial law" means the provisions of this title,
the enumerated consumer laws, the laws for which authorities
are transferred under subtitles F and H, and any rule or
order prescribed by the Bureau under this title, an enumerated
consumer law, or pursuant to the authorities transferred under
subtitles F and H. The term does not include the Federal
Trade Commission Act.

(15) FINANCIAL PRODUCT OR SERVICE.—

(A) IN GENERAL.—The term "financial product or
service" means—

H. R. 4173—583

(i) extending credit and servicing loans, including acquiring, purchasing, selling, brokering, or other extensions of credit (other than solely extending commercial credit to a person who originates consumer credit transactions);

(ii) extending or brokering leases of personal or real property that are the functional equivalent of purchase finance arrangements, if—

(I) the lease is on a non-operating basis;

(II) the initial term of the lease is at least 90 days; and

(III) in the case of a lease involving real property, at the inception of the initial lease, the transaction is intended to result in ownership of the leased property to be transferred to the lessee, subject to standards prescribed by the Bureau;

(iii) providing real estate settlement services, except such services excluded under subparagraph (C), or performing appraisals of real estate or personal property;

(iv) engaging in deposit-taking activities, transmitting or exchanging funds, or otherwise acting as a custodian of funds or any financial instrument for use by or on behalf of a consumer;

(v) selling, providing, or issuing stored value or payment instruments, except that, in the case of a sale of, or transaction to reload, stored value, only if the seller exercises substantial control over the terms or conditions of the stored value provided to the consumer where, for purposes of this clause—

(I) a seller shall not be found to exercise substantial control over the terms or conditions of the stored value if the seller is not a party to the contract with the consumer for the stored value product, and another person is principally responsible for establishing the terms or conditions of the stored value; and

(II) advertising the nonfinancial goods or services of the seller on the stored value card or device is not in itself an exercise of substantial control over the terms or conditions;

(vi) providing check cashing, check collection, or check guaranty services;

(vii) providing payments or other financial data processing products or services to a consumer by any technological means, including processing or storing financial or banking data for any payment instrument, or through any payments systems or network used for processing payments data, including payments made through an online banking system or mobile telecommunications network, except that a person shall not be deemed to be a covered person with respect to financial data processing solely because the person—

H. R. 4173—584

(I) is a merchant, retailer, or seller of any nonfinancial good or service who engages in financial data processing by transmitting or storing payments data about a consumer exclusively for purpose of initiating payments instructions by the consumer to pay such person for the purchase of, or to complete a commercial transaction for, such nonfinancial good or service sold directly by such person to the consumer; or

(II) provides access to a host server to a person for purposes of enabling that person to establish and maintain a website;

(viii) providing financial advisory services (other than services relating to securities provided by a person regulated by the Commission or a person regulated by a State securities Commission, but only to the extent that such person acts in a regulated capacity) to consumers on individual financial matters or relating to proprietary financial products or services (other than by publishing any bona fide newspaper, news magazine, or business or financial publication of general and regular circulation, including publishing market data, news, or data analytics or investment information or recommendations that are not tailored to the individual needs of a particular consumer), including—

(I) providing credit counseling to any consumer; and

(II) providing services to assist a consumer with debt management or debt settlement, modifying the terms of any extension of credit, or avoiding foreclosure;

(ix) collecting, analyzing, maintaining, or providing consumer report information or other account information, including information relating to the credit history of consumers, used or expected to be used in connection with any decision regarding the offering or provision of a consumer financial product or service, except to the extent that—

(I) a person—

(aa) collects, analyzes, or maintains information that relates solely to the transactions between a consumer and such person;

(bb) provides the information described in item (aa) to an affiliate of such person; or

(cc) provides information that is used or expected to be used solely in any decision regarding the offering or provision of a product or service that is not a consumer financial product or service, including a decision for employment, government licensing, or a residential lease or tenancy involving a consumer; and

(II) the information described in subclause (I)(aa) is not used by such person or affiliate in connection with any decision regarding the offering or provision of a consumer financial product or

H. R. 4173—585

service to the consumer, other than credit described in section 1027(a)(2)(A);

(x) collecting debt related to any consumer financial product or service; and

(xi) such other financial product or service as may be defined by the Bureau, by regulation, for purposes of this title, if the Bureau finds that such financial product or service is—

(I) entered into or conducted as a subterfuge or with a purpose to evade any Federal consumer financial law; or

(II) permissible for a bank or for a financial holding company to offer or to provide under any provision of a Federal law or regulation applicable to a bank or a financial holding company, and has, or likely will have, a material impact on consumers.

(B) RULE OF CONSTRUCTION.—

(i) IN GENERAL.—For purposes of subparagraph (A)(xi)(II), and subject to clause (ii) of this subparagraph, the following activities provided to a covered person shall not, for purposes of this title, be considered incidental or complementary to a financial activity permissible for a financial holding company to engage in under any provision of a Federal law or regulation applicable to a financial holding company:

(I) Providing information products or services to a covered person for identity authentication.

(II) Providing information products or services for fraud or identify theft detection, prevention, or investigation.

(III) Providing document retrieval or delivery services.

(IV) Providing public records information retrieval.

(V) Providing information products or services for anti-money laundering activities.

(ii) LIMITATION.—Nothing in clause (i) may be construed as modifying or limiting the authority of the Bureau to exercise any—

(I) examination or enforcement powers authority under this title with respect to a covered person or service provider engaging in an activity described in subparagraph (A)(ix); or

(II) powers authorized by this title to prescribe rules, issue orders, or take other actions under any enumerated consumer law or law for which the authorities are transferred under subtitle F or H.

(C) EXCLUSIONS.—The term "financial product or service" does not include—

(i) the business of insurance; or

(ii) electronic conduit services.

(16) FOREIGN EXCHANGE.—The term "foreign exchange" means the exchange, for compensation, of currency of the United States or of a foreign government for currency of another government.

H. R. 4173—586

(17) INSURED CREDIT UNION.—The term "insured credit union" has the same meaning as in section 101 of the Federal Credit Union Act (12 U.S.C. 1752).

(18) PAYMENT INSTRUMENT.—The term "payment instrument" means a check, draft, warrant, money order, traveler's check, electronic instrument, or other instrument, payment of funds, or monetary value (other than currency).

(19) PERSON.—The term "person" means an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity.

(20) PERSON REGULATED BY THE COMMODITY FUTURES TRADING COMMISSION.—The term "person regulated by the Commodity Futures Trading Commission" means any person that is registered, or required by statute or regulation to be registered, with the Commodity Futures Trading Commission, but only to the extent that the activities of such person are subject to the jurisdiction of the Commodity Futures Trading Commission under the Commodity Exchange Act.

(21) PERSON REGULATED BY THE COMMISSION.—The term "person regulated by the Commission" means a person who is—

(A) a broker or dealer that is required to be registered under the Securities Exchange Act of 1934;

(B) an investment adviser that is registered under the Investment Advisers Act of 1940;

(C) an investment company that is required to be registered under the Investment Company Act of 1940, and any company that has elected to be regulated as a business development company under that Act;

(D) a national securities exchange that is required to be registered under the Securities Exchange Act of 1934;

(E) a transfer agent that is required to be registered under the Securities Exchange Act of 1934;

(F) a clearing corporation that is required to be registered under the Securities Exchange Act of 1934;

(G) any self-regulatory organization that is required to be registered with the Commission;

(H) any nationally recognized statistical rating organization that is required to be registered with the Commission;

(I) any securities information processor that is required to be registered with the Commission;

(J) any municipal securities dealer that is required to be registered with the Commission;

(K) any other person that is required to be registered with the Commission under the Securities Exchange Act of 1934; and

(L) any employee, agent, or contractor acting on behalf of, registered with, or providing services to, any person described in any of subparagraphs (A) through (K), but only to the extent that any person described in any of subparagraphs (A) through (K), or the employee, agent, or contractor of such person, acts in a regulated capacity.

(22) PERSON REGULATED BY A STATE INSURANCE REGULATOR.—The term "person regulated by a State insurance regulator" means any person that is engaged in the business of

H. R. 4173—587

insurance and subject to regulation by any State insurance regulator, but only to the extent that such person acts in such capacity.

(23) PERSON THAT PERFORMS INCOME TAX PREPARATION ACTIVITIES FOR CONSUMERS.—The term "person that performs income tax preparation activities for consumers" means—

(A) any tax return preparer (as defined in section 7701(a)(36) of the Internal Revenue Code of 1986), regardless of whether compensated, but only to the extent that the person acts in such capacity;

(B) any person regulated by the Secretary under section 330 of title 31, United States Code, but only to the extent that the person acts in such capacity; and

(C) any authorized IRS e-file Providers (as defined for purposes of section 7216 of the Internal Revenue Code of 1986), but only to the extent that the person acts in such capacity.

(24) PRUDENTIAL REGULATOR.—The term "prudential regulator" means—

(A) in the case of an insured depository institution or depository institution holding company (as defined in section 3 of the Federal Deposit Insurance Act), or subsidiary of such institution or company, the appropriate Federal banking agency, as that term is defined in section 3 of the Federal Deposit Insurance Act; and

(B) in the case of an insured credit union, the National Credit Union Administration.

(25) RELATED PERSON.—The term "related person"—

(A) shall apply only with respect to a covered person that is not a bank holding company (as that term is defined in section 2 of the Bank Holding Company Act of 1956), credit union, or depository institution;

(B) shall be deemed to mean a covered person for all purposes of any provision of Federal consumer financial law; and

(C) means—

(i) any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of, or agent for, such covered person;

(ii) any shareholder, consultant, joint venture partner, or other person, as determined by the Bureau (by rule or on a case-by-case basis) who materially participates in the conduct of the affairs of such covered person; and

(iii) any independent contractor (including any attorney, appraiser, or accountant) who knowingly or recklessly participates in any—

(I) violation of any provision of law or regulation; or

(II) breach of a fiduciary duty.

(26) SERVICE PROVIDER.—

(A) IN GENERAL.—The term "service provider" means any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that—

H. R. 4173—588

(i) participates in designing, operating, or maintaining the consumer financial product or service; or

(ii) processes transactions relating to the consumer financial product or service (other than unknowingly or incidentally transmitting or processing financial data in a manner that such data is undifferentiated from other types of data of the same form as the person transmits or processes).

(B) EXCEPTIONS.—The term "service provider" does not include a person solely by virtue of such person offering or providing to a covered person—

(i) a support service of a type provided to businesses generally or a similar ministerial service; or

(ii) time or space for an advertisement for a consumer financial product or service through print, newspaper, or electronic media.

(C) RULE OF CONSTRUCTION.—A person that is a service provider shall be deemed to be a covered person to the extent that such person engages in the offering or provision of its own consumer financial product or service.

(27) STATE.—The term "State" means any State, territory, or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, Guam, American Samoa, or the United States Virgin Islands or any federally recognized Indian tribe, as defined by the Secretary of the Interior under section 104(a) of the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 479a–1(a)).

(28) STORED VALUE.—

(A) IN GENERAL.—The term "stored value" means funds or monetary value represented in any electronic format, whether or not specially encrypted, and stored or capable of storage on electronic media in such a way as to be retrievable and transferred electronically, and includes a prepaid debit card or product, or any other similar product, regardless of whether the amount of the funds or monetary value may be increased or reloaded.

(B) EXCLUSION.—Notwithstanding subparagraph (A), the term "stored value" does not include a special purpose card or certificate, which shall be defined for purposes of this paragraph as funds or monetary value represented in any electronic format, whether or not specially encrypted, that is—

(i) issued by a merchant, retailer, or other seller of nonfinancial goods or services;

(ii) redeemable only for transactions with the merchant, retailer, or seller of nonfinancial goods or services or with an affiliate of such person, which affiliate itself is a merchant, retailer, or seller of nonfinancial goods or services;

(iii) issued in a specified amount that, except in the case of a card or product used solely for telephone services, may not be increased or reloaded;

(iv) purchased on a prepaid basis in exchange for payment; and

H. R. 4173—589

(v) honored upon presentation to such merchant, retailer, or seller of nonfinancial goods or services or an affiliate of such person, which affiliate itself is a merchant, retailer, or seller of nonfinancial goods or services, only for any nonfinancial goods or services.

(29) TRANSMITTING OR EXCHANGING FUNDS.—The term "transmitting or exchanging funds" means receiving currency, monetary value, or payment instruments from a consumer for the purpose of exchanging or transmitting the same by any means, including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services or through other businesses that facilitate third-party transfers within the United States or to or from the United States.

# Subtitle A—Bureau of Consumer Financial Protection

**SEC. 1011. ESTABLISHMENT OF THE BUREAU OF CONSUMER FINAN-CIAL PROTECTION.**

(a) BUREAU ESTABLISHED.—There is established in the Federal Reserve System, an independent bureau to be known as the "Bureau of Consumer Financial Protection", which shall regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws. The Bureau shall be considered an Executive agency, as defined in section 105 of title 5, United States Code. Except as otherwise provided expressly by law, all Federal laws dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5, shall apply to the exercise of the powers of the Bureau.

(b) DIRECTOR AND DEPUTY DIRECTOR.—

(1) IN GENERAL.—There is established the position of the Director, who shall serve as the head of the Bureau.

(2) APPOINTMENT.—Subject to paragraph (3), the Director shall be appointed by the President, by and with the advice and consent of the Senate.

(3) QUALIFICATION.—The President shall nominate the Director from among individuals who are citizens of the United States.

(4) COMPENSATION.—The Director shall be compensated at the rate prescribed for level II of the Executive Schedule under section 5313 of title 5, United States Code.

(5) DEPUTY DIRECTOR.—There is established the position of Deputy Director, who shall—

(A) be appointed by the Director; and

(B) serve as acting Director in the absence or unavailability of the Director.

(c) TERM.—

(1) IN GENERAL.—The Director shall serve for a term of 5 years.

(2) EXPIRATION OF TERM.—An individual may serve as Director after the expiration of the term for which appointed, until a successor has been appointed and qualified.

(3) REMOVAL FOR CAUSE.—The President may remove the Director for inefficiency, neglect of duty, or malfeasance in office.

H. R. 4173—636

(C) to make reports or provide information to the Bureau; or

(3) any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 1031, or any rule or order issued thereunder, and notwithstanding any provision of this title, the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided.

(b) EXCEPTION.—No person shall be held to have violated subsection (a)(1) solely by virtue of providing or selling time or space to a covered person or service provider placing an advertisement.

**SEC. 1037. EFFECTIVE DATE.**

This subtitle shall take effect on the designated transfer date.

## Subtitle D—Preservation of State Law

**SEC. 1041. RELATION TO STATE LAW.**

(a) IN GENERAL.—

(1) RULE OF CONSTRUCTION.—This title, other than sections 1044 through 1048, may not be construed as annulling, altering, or affecting, or exempting any person subject to the provisions of this title from complying with, the statutes, regulations, orders, or interpretations in effect in any State, except to the extent that any such provision of law is inconsistent with the provisions of this title, and then only to the extent of the inconsistency.

(2) GREATER PROTECTION UNDER STATE LAW.—For purposes of this subsection, a statute, regulation, order, or interpretation in effect in any State is not inconsistent with the provisions of this title if the protection that such statute, regulation, order, or interpretation affords to consumers is greater than the protection provided under this title. A determination regarding whether a statute, regulation, order, or interpretation in effect in any State is inconsistent with the provisions of this title may be made by the Bureau on its own motion or in response to a nonfrivolous petition initiated by any interested person.

(b) RELATION TO OTHER PROVISIONS OF ENUMERATED CONSUMER LAWS THAT RELATE TO STATE LAW.—No provision of this title, except as provided in section 1083, shall be construed as modifying, limiting, or superseding the operation of any provision of an enumerated consumer law that relates to the application of a law in effect in any State with respect to such Federal law.

(c) ADDITIONAL CONSUMER PROTECTION REGULATIONS IN RESPONSE TO STATE ACTION.—

(1) NOTICE OF PROPOSED RULE REQUIRED.—The Bureau shall issue a notice of proposed rulemaking whenever a majority of the States has enacted a resolution in support of the establishment or modification of a consumer protection regulation by the Bureau.

(2) BUREAU CONSIDERATIONS REQUIRED FOR ISSUANCE OF FINAL REGULATION.—Before prescribing a final regulation based upon a notice issued pursuant to paragraph (1), the Bureau shall take into account whether—

H. R. 4173—637

(A) the proposed regulation would afford greater protection to consumers than any existing regulation;

(B) the intended benefits of the proposed regulation for consumers would outweigh any increased costs or inconveniences for consumers, and would not discriminate unfairly against any category or class of consumers; and

(C) a Federal banking agency has advised that the proposed regulation is likely to present an unacceptable safety and soundness risk to insured depository institutions.

(3) EXPLANATION OF CONSIDERATIONS.—The Bureau—

(A) shall include a discussion of the considerations required in paragraph (2) in the Federal Register notice of a final regulation prescribed pursuant to this subsection; and

(B) whenever the Bureau determines not to prescribe a final regulation, shall publish an explanation of such determination in the Federal Register, and provide a copy of such explanation to each State that enacted a resolution in support of the proposed regulation, the Committee on Banking, Housing, and Urban Affairs of the Senate, and the Committee on Financial Services of the House of Representatives.

(4) RESERVATION OF AUTHORITY.—No provision of this subsection shall be construed as limiting or restricting the authority of the Bureau to enhance consumer protection standards established pursuant to this title in response to its own motion or in response to a request by any other interested person.

(5) RULE OF CONSTRUCTION.—No provision of this subsection shall be construed as exempting the Bureau from complying with subchapter II of chapter 5 of title 5, United States Code.

(6) DEFINITION.—For purposes of this subsection, the term "consumer protection regulation" means a regulation that the Bureau is authorized to prescribe under the Federal consumer financial laws.

**SEC. 1042. PRESERVATION OF ENFORCEMENT POWERS OF STATES.**

(a) IN GENERAL.—

(1) ACTION BY STATE.—Except as provided in paragraph (2), the attorney general (or the equivalent thereof) of any State may bring a civil action in the name of such State in any district court of the United States in that State or in State court that is located in that State and that has jurisdiction over the defendant, to enforce provisions of this title or regulations issued under this title, and to secure remedies under provisions of this title or remedies otherwise provided under other law. A State regulator may bring a civil action or other appropriate proceeding to enforce the provisions of this title or regulations issued under this title with respect to any entity that is State-chartered, incorporated, licensed, or otherwise authorized to do business under State law (except as provided in paragraph (2)), and to secure remedies under provisions of this title or remedies otherwise provided under other provisions of law with respect to such an entity.

H. R. 4173—638

(2) ACTION BY STATE AGAINST NATIONAL BANK OR FEDERAL SAVINGS ASSOCIATION TO ENFORCE RULES.—

(A) IN GENERAL.—Except as permitted under subparagraph (B), the attorney general (or equivalent thereof) of any State may not bring a civil action in the name of such State against a national bank or Federal savings association to enforce a provision of this title.

(B) ENFORCEMENT OF RULES PERMITTED.—The attorney general (or the equivalent thereof) of any State may bring a civil action in the name of such State against a national bank or Federal savings association in any district court of the United States in the State or in State court that is located in that State and that has jurisdiction over the defendant to enforce a regulation prescribed by the Bureau under a provision of this title and to secure remedies under provisions of this title or remedies otherwise provided under other law.

(3) RULE OF CONSTRUCTION.—No provision of this title shall be construed as modifying, limiting, or superseding the operation of any provision of an enumerated consumer law that relates to the authority of a State attorney general or State regulator to enforce such Federal law.

(b) CONSULTATION REQUIRED.—

(1) NOTICE.—

(A) IN GENERAL.—Before initiating any action in a court or other administrative or regulatory proceeding against any covered person as authorized by subsection (a) to enforce any provision of this title, including any regulation prescribed by the Bureau under this title, a State attorney general or State regulator shall timely provide a copy of the complete complaint to be filed and written notice describing such action or proceeding to the Bureau and the prudential regulator, if any, or the designee thereof.

(B) EMERGENCY ACTION.—If prior notice is not practicable, the State attorney general or State regulator shall provide a copy of the complete complaint and the notice to the Bureau and the prudential regulator, if any, immediately upon instituting the action or proceeding.

(C) CONTENTS OF NOTICE.—The notification required under this paragraph shall, at a minimum, describe—

(i) the identity of the parties;

(ii) the alleged facts underlying the proceeding; and

(iii) whether there may be a need to coordinate the prosecution of the proceeding so as not to interfere with any action, including any rulemaking, undertaken by the Bureau, a prudential regulator, or another Federal agency.

(2) BUREAU RESPONSE.—In any action described in paragraph (1), the Bureau may—

(A) intervene in the action as a party;

(B) upon intervening—

(i) remove the action to the appropriate United States district court, if the action was not originally brought there; and

H. R. 4173—639

(ii) be heard on all matters arising in the action; and

(C) appeal any order or judgment, to the same extent as any other party in the proceeding may.

(c) REGULATIONS.—The Bureau shall prescribe regulations to implement the requirements of this section and, from time to time, provide guidance in order to further coordinate actions with the State attorneys general and other regulators.

(d) PRESERVATION OF STATE AUTHORITY.—

(1) STATE CLAIMS.—No provision of this section shall be construed as altering, limiting, or affecting the authority of a State attorney general or any other regulatory or enforcement agency or authority to bring an action or other regulatory proceeding arising solely under the law in effect in that State.

(2) STATE SECURITIES REGULATORS.—No provision of this title shall be construed as altering, limiting, or affecting the authority of a State securities commission (or any agency or office performing like functions) under State law to adopt rules, initiate enforcement proceedings, or take any other action with respect to a person regulated by such commission or authority.

(3) STATE INSURANCE REGULATORS.—No provision of this title shall be construed as altering, limiting, or affecting the authority of a State insurance commission or State insurance regulator under State law to adopt rules, initiate enforcement proceedings, or take any other action with respect to a person regulated by such commission or regulator.

**SEC. 1043. PRESERVATION OF EXISTING CONTRACTS.**

This title, and regulations, orders, guidance, and interpretations prescribed, issued, or established by the Bureau, shall not be construed to alter or affect the applicability of any regulation, order, guidance, or interpretation prescribed, issued, and established by the Comptroller of the Currency or the Director of the Office of Thrift Supervision regarding the applicability of State law under Federal banking law to any contract entered into on or before the date of enactment of this Act, by national banks, Federal savings associations, or subsidiaries thereof that are regulated and supervised by the Comptroller of the Currency or the Director of the Office of Thrift Supervision, respectively.

**SEC. 1044. STATE LAW PREEMPTION STANDARDS FOR NATIONAL BANKS AND SUBSIDIARIES CLARIFIED.**

(a) IN GENERAL.—Chapter one of title LXII of the Revised Statutes of the United States (12 U.S.C. 21 et seq.) is amended by inserting after section 5136B the following new section:

**"SEC. 5136C. STATE LAW PREEMPTION STANDARDS FOR NATIONAL BANKS AND SUBSIDIARIES CLARIFIED.**

"(a) DEFINITIONS.—For purposes of this section, the following definitions shall apply:

"(1) NATIONAL BANK.—The term 'national bank' includes—

"(A) any bank organized under the laws of the United States; and

"(B) any Federal branch established in accordance with the International Banking Act of 1978.

"(2) STATE CONSUMER FINANCIAL LAWS.—The term 'State consumer financial law' means a State law that does not directly or indirectly discriminate against national banks and that

H. R. 4173—640

directly and specifically regulates the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer.

"(3) OTHER DEFINITIONS.—The terms 'affiliate', 'subsidiary', 'includes', and 'including' have the same meanings as in section 3 of the Federal Deposit Insurance Act.

"(b) PREEMPTION STANDARD.—

"(1) IN GENERAL.—State consumer financial laws are preempted, only if—

"(A) application of a State consumer financial law would have a discriminatory effect on national banks, in comparison with the effect of the law on a bank chartered by that State;

"(B) in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in Barnett Bank of Marion County, N. A. v. Nelson, Florida Insurance Commissioner, et al., 517 U.S. 25 (1996), the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers; and any preemption determination under this subparagraph may be made by a court, or by regulation or order of the Comptroller of the Currency on a case-by-case basis, in accordance with applicable law; or

"(C) the State consumer financial law is preempted by a provision of Federal law other than this title.

"(2) SAVINGS CLAUSE.—This title and section 24 of the Federal Reserve Act (12 U.S.C. 371) do not preempt, annul, or affect the applicability of any State law to any subsidiary or affiliate of a national bank (other than a subsidiary or affiliate that is chartered as a national bank).

"(3) CASE-BY-CASE BASIS.—

"(A) DEFINITION.—As used in this section the term 'case-by-case basis' refers to a determination pursuant to this section made by the Comptroller concerning the impact of a particular State consumer financial law on any national bank that is subject to that law, or the law of any other State with substantively equivalent terms.

"(B) CONSULTATION.—When making a determination on a case-by-case basis that a State consumer financial law of another State has substantively equivalent terms as one that the Comptroller is preempting, the Comptroller shall first consult with the Bureau of Consumer Financial Protection and shall take the views of the Bureau into account when making the determination.

"(4) RULE OF CONSTRUCTION.—This title does not occupy the field in any area of State law.

"(5) STANDARDS OF REVIEW.—

"(A) PREEMPTION.—A court reviewing any determinations made by the Comptroller regarding preemption of a State law by this title or section 24 of the Federal Reserve Act (12 U.S.C. 371) shall assess the validity of such determinations, depending upon the thoroughness evident in the consideration of the agency, the validity of the reasoning of the agency, the consistency with other valid determinations made by the agency, and other factors

H. R. 4173—641

which the court finds persuasive and relevant to its decision.

"(B) SAVINGS CLAUSE.—Except as provided in subparagraph (A), nothing in this section shall affect the deference that a court may afford to the Comptroller in making determinations regarding the meaning or interpretation of title LXII of the Revised Statutes of the United States or other Federal laws.

"(6) COMPTROLLER DETERMINATION NOT DELEGABLE.—Any regulation, order, or determination made by the Comptroller of the Currency under paragraph (1)(B) shall be made by the Comptroller, and shall not be delegable to another officer or employee of the Comptroller of the Currency.

"(c) SUBSTANTIAL EVIDENCE.—No regulation or order of the Comptroller of the Currency prescribed under subsection (b)(1)(B), shall be interpreted or applied so as to invalidate, or otherwise declare inapplicable to a national bank, the provision of the State consumer financial law, unless substantial evidence, made on the record of the proceeding, supports the specific finding regarding the preemption of such provision in accordance with the legal standard of the decision of the Supreme Court of the United States in Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al., 517 U.S. 25 (1996).

"(d) PERIODIC REVIEW OF PREEMPTION DETERMINATIONS.—

"(1) IN GENERAL.—The Comptroller of the Currency shall periodically conduct a review, through notice and public comment, of each determination that a provision of Federal law preempts a State consumer financial law. The agency shall conduct such review within the 5-year period after prescribing or otherwise issuing such determination, and at least once during each 5-year period thereafter. After conducting the review of, and inspecting the comments made on, the determination, the agency shall publish a notice in the Federal Register announcing the decision to continue or rescind the determination or a proposal to amend the determination. Any such notice of a proposal to amend a determination and the subsequent resolution of such proposal shall comply with the procedures set forth in subsections (a) and (b) of section 5244 of the Revised Statutes of the United States (12 U.S.C. 43 (a), (b)).

"(2) REPORTS TO CONGRESS.—At the time of issuing a review conducted under paragraph (1), the Comptroller of the Currency shall submit a report regarding such review to the Committee on Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate. The report submitted to the respective committees shall address whether the agency intends to continue, rescind, or propose to amend any determination that a provision of Federal law preempts a State consumer financial law, and the reasons therefor.

"(e) APPLICATION OF STATE CONSUMER FINANCIAL LAW TO SUBSIDIARIES AND AFFILIATES.—Notwithstanding any provision of this title or section 24 of Federal Reserve Act (12 U.S.C. 371), a State consumer financial law shall apply to a subsidiary or affiliate of a national bank (other than a subsidiary or affiliate that is chartered as a national bank) to the same extent that

H. R. 4173—642

the State consumer financial law applies to any person, corporation, or other entity subject to such State law.

"(f) PRESERVATION OF POWERS RELATED TO CHARGING INTEREST.—No provision of this title shall be construed as altering or otherwise affecting the authority conferred by section 5197 of the Revised Statutes of the United States (12 U.S.C. 85) for the charging of interest by a national bank at the rate allowed by the laws of the State, territory, or district where the bank is located, including with respect to the meaning of 'interest' under such provision.

"(g) TRANSPARENCY OF OCC PREEMPTION DETERMINATIONS.— The Comptroller of the Currency shall publish and update no less frequently than quarterly, a list of preemption determinations by the Comptroller of the Currency then in effect that identifies the activities and practices covered by each determination and the requirements and constraints determined to be preempted.".

(b) CLERICAL AMENDMENT.—The table of sections for chapter one of title LXII of the Revised Statutes of the United States is amended by inserting after the item relating to section 5136B the following new item:

"Sec. 5136C. State law preemption standards for national banks and subsidiaries clarified.".

**SEC. 1045. CLARIFICATION OF LAW APPLICABLE TO NONDEPOSITORY INSTITUTION SUBSIDIARIES.**

Section 5136C of the Revised Statutes of the United States (as added by this subtitle) is amended by adding at the end the following:

"(h) CLARIFICATION OF LAW APPLICABLE TO NONDEPOSITORY INSTITUTION SUBSIDIARIES AND AFFILIATES OF NATIONAL BANKS.—

"(1) DEFINITIONS.—For purposes of this subsection, the terms 'depository institution', 'subsidiary', and 'affiliate' have the same meanings as in section 3 of the Federal Deposit Insurance Act.

"(2) RULE OF CONSTRUCTION.—No provision of this title or section 24 of the Federal Reserve Act (12 U.S.C. 371) shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank (other than a subsidiary, affiliate, or agent that is chartered as a national bank).".

**SEC. 1046. STATE LAW PREEMPTION STANDARDS FOR FEDERAL SAVINGS ASSOCIATIONS AND SUBSIDIARIES CLARIFIED.**

(a) IN GENERAL.—The Home Owners' Loan Act (12 U.S.C. 1461 et seq.) is amended by inserting after section 5 the following new section:

**"SEC. 6. STATE LAW PREEMPTION STANDARDS FOR FEDERAL SAVINGS ASSOCIATIONS CLARIFIED.**

"(a) IN GENERAL.—Any determination by a court or by the Director or any successor officer or agency regarding the relation of State law to a provision of this Act or any regulation or order prescribed under this Act shall be made in accordance with the laws and legal standards applicable to national banks regarding the preemption of State law.

"(b) PRINCIPLES OF CONFLICT PREEMPTION APPLICABLE.—Notwithstanding the authorities granted under sections 4 and 5, this Act does not occupy the field in any area of State law.".

H. R. 4173—643

(b) CLERICAL AMENDMENT.—The table of sections for the Home Owners' Loan Act (12 U.S.C. 1461 et seq.) is amended by striking the item relating to section 6 and inserting the following new item:

"Sec. 6. State law preemption standards for Federal savings associations and subsidiaries clarified.".

### SEC. 1047. VISITORIAL STANDARDS FOR NATIONAL BANKS AND SAVINGS ASSOCIATIONS.

(a) NATIONAL BANKS.—Section 5136C of the Revised Statutes of the United States (as added by this subtitle) is amended by adding at the end the following:

"(i) VISITORIAL POWERS.—

"(1) IN GENERAL.—In accordance with the decision of the Supreme Court of the United States in Cuomo v. Clearing House Assn., L. L. C. (129 S. Ct. 2710 (2009)), no provision of this title which relates to visitorial powers or otherwise limits or restricts the visitorial authority to which any national bank is subject shall be construed as limiting or restricting the authority of any attorney general (or other chief law enforcement officer) of any State to bring an action against a national bank in a court of appropriate jurisdiction to enforce an applicable law and to seek relief as authorized by such law.

"(j) ENFORCEMENT ACTIONS.—The ability of the Comptroller of the Currency to bring an enforcement action under this title or section 5 of the Federal Trade Commission Act does not preclude any private party from enforcing rights granted under Federal or State law in the courts.".

(b) SAVINGS ASSOCIATIONS.—Section 6 of the Home Owners' Loan Act (as added by this title) is amended by adding at the end the following:

"(c) VISITORIAL POWERS.—The provisions of sections 5136C(i) of the Revised Statutes of the United States shall apply to Federal savings associations, and any subsidiary thereof, to the same extent and in the same manner as if such savings associations, or subsidiaries thereof, were national banks or subsidiaries of national banks, respectively."

"(d) ENFORCEMENT ACTIONS.—The ability of the Comptroller of the Currency to bring an enforcement action under this Act or section 5 of the Federal Trade Commission Act does not preclude any private party from enforcing rights granted under Federal or State law in the courts.".

### SEC. 1048. EFFECTIVE DATE.

This subtitle shall become effective on the designated transfer date.

# Subtitle E—Enforcement Powers

### SEC. 1051. DEFINITIONS.

For purposes of this subtitle, the following definitions shall apply:

(1) BUREAU INVESTIGATION.—The term "Bureau investigation" means any inquiry conducted by a Bureau investigator for the purpose of ascertaining whether any person is or has

BILLING CODE: 4810-33-P

# DEPARTMENT OF THE TREASURY

## Office of the Comptroller of the Currency

## 12 CFR Parts 4, 5, 7, 8, 28, and 34

## [Docket ID OCC-2011-0006]

## RIN 1557-AD41

## Office of Thrift Supervision Integration; Dodd-Frank Act Implementation

**AGENCY:** Office of the Comptroller of the Currency, Treasury.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Office of the Comptroller of the Currency (OCC) is proposing to amend its regulations governing organization and functions, availability and release of information, and post-employment restrictions for senior examiners; and assessment of fees to incorporate the transfer of certain functions of the Office of Thrift Supervision (OTS) to the OCC pursuant to Title III of the Dodd-Frank Wall Street Reform and Consumer Protection Act. The OCC also is proposing amendments to its rules pertaining to change in control of credit card banks and trust banks to implement section 603 of the Act; deposit-taking by uninsured Federal branches to implement section 335 of the Act; and its preemption and visitorial powers rules, subpart D, to implement various sections of the Act.

**DATES:** Comments must be received on or before [INSERT DATE THAT IS 30 DAYS AFTER THE DATE OF PUBLICATION IN THE FEDERAL REGISTER].

**ADDRESSES:** Because paper mail in the Washington, DC area and at the OCC is subject to delay, commenters are encouraged to submit comments by the Federal eRulemaking Portal or e-

1

1821(a)(1)(E) to mean $100,000, subject to certain adjustments provided for in the statute.

Section 335 of the Dodd-Frank Act, which takes effect on the transfer date, amends 12 U.S.C.

1821(a)(1)(E) to change the amount from $100,000 to $250,000.  Section 28.16(b) of the OCC's

regulations states that an uninsured Federal branch may accept initial deposits of less than

$100,000 only from certain persons.  In order to conform this section of the OCC's regulations to

the statutory changes and to prevent the need to continually amend this section for changes in the

SMDIA, the proposal amends 12 CFR 28.16(b) to refer to 12 U.S.C. 1821(a)(1)(E), rather than

the obsolete reference to $100,000.

### 3.      Dodd-Frank Act Provisions Affecting Preemption and Visitorial Powers (Parts 5, 7, and 34)

a.      <u>Preemption</u>

The Dodd-Frank Act contains provisions that affect the scope of national bank

preemption, effective as of the transfer date.[9]  The Act eliminates preemption of state law for

national bank subsidiaries, agents and affiliates.[10]  We therefore propose to rescind 12 CFR

7.4006, which is the OCC's regulation concerning the application of state laws to national bank

operating subsidiaries.

The Act also changes the preemption standards applicable to Federal savings associations

to conform to those applicable to national banks.[11]  The Act specifically provides that, as of the

---

[9]  Section 1044, which amends chapter one of title LXII of the Revised Statutes by inserting a new section 5136C, contains the principal national bank preemption provisions.

[10]  Dodd-Frank Act sections 1044(a), 1045, 124 Stat. 1376, 2016, 2017 (July 21, 2010).

[11]  Dodd-Frank Act section 1046, 124 Stat. 2017 (<u>to be codified</u> at 12 U.S.C. 1465). In addition, the Act states that the provisions in section 1044 regarding visitorial powers shall apply to Federal savings associations and their subsidiaries to the same extent and in the same manner as if they were national banks or national bank subsidiaries. Dodd-Frank Act section 1047(b), 124 Stat. 2018 (<u>to be codified</u> at 12 U.S.C. 1465).

transfer date, determinations by a court or by the OCC under the Home Owners' Loan Act (HOLA) with respect to Federal savings associations must be made in accordance with the laws and legal standards applicable to national banks regarding the application of state law.[12]

In order to implement this standard for Federal savings associations, the OCC is proposing amendments to its regulations to apply national bank standards on preemption and visitorial powers to Federal savings associations and their subsidiaries to the same extent and in the same manner as these standards apply to national banks and their subsidiaries.[13]

In addition, section 1044 of the Dodd-Frank Act contains several provisions addressing preemption of "state consumer financial laws."[14]  The Act provides that "state consumer financial laws" may be preempted only if: (1) application of such a law would have a "discriminatory effect" on national banks compared with state-chartered banks in that state;  (2) "in accordance with the legal standard for preemption" in the Supreme Court's decision in Barnett Bank of Marion County, N.A. v. Nelson,[15] the state consumer financial law "prevents or significantly interferes with the exercise by the national bank of its powers" ("Barnett standard" preemption); or (3) the state consumer financial law is preempted by a provision of Federal law other than Title LXII of the Revised Statutes.[16]

---

[12] Id.

[13] To fulfill this statutory mandate, the affected OTS preemption regulations will be repealed.

[14] The Dodd-Frank Act defines the term "state consumer financial law" to mean a state law that (1) does not directly or indirectly discriminate against national banks and that (2) directly and specifically (3) regulates the manner, content, or terms and conditions of (4) any financial transaction or related account (5) with respect to a consumer.  Dodd-Frank Act section 1044(a), 124 Stat. at 2014-2015.

[15] 517 U.S. 25 (1996).

[16] Dodd-Frank Act section 1044(a), 124 Stat. at 2015.

Because these provisions only apply to preemption of "state consumer financial laws," they do not affect the application of OCC regulations to state laws that do not come within that definition.  We have therefore examined whether these Dodd-Frank provisions, and particularly the <u>Barnett</u> standard preemption provision, require changes to our rules with respect to that category of state law.

The language of the <u>Barnett</u> standard preemption provision in the final legislation differs substantially from earlier versions of the legislation.  The version of the legislation passed by the House of Representatives made no reference to the <u>Barnett</u> decision.[17]  Important changes were made in the Senate as the legislation progressed and sponsors of key language that was ultimately adopted have explained that the changes were intended to provide consistency and legal certainty by preserving the preemption standard of the Supreme Court's <u>Barnett</u> decision.[18]

This is consistent with both the language of the statute and the substance of the <u>Barnett</u> decision.  The <u>Barnett</u> standard preemption provision instructs that preemption will occur, if, "in accordance with the legal standard for preemption in the decision of the Supreme Court" in <u>Barnett</u>, a state consumer financial law "prevents or significantly interferes with the exercise by a national bank of its powers."[19]  The legal standard for preemption in <u>Barnett</u> is conflict preemption and the decision references different formulations of conflict to illustrate and explain the nature and level of interference with national bank powers that triggers preemption.  The phrase "prevent or significantly interfere" is one exemplary formulation of conflict preemption

---

[17]  <u>See</u> H.R. 4103, 111th Cong. section 4404 (as passed by the House of Representatives Dec. 11, 2009).

[18]  <u>See</u> 156 Cong. Rec. S5870-02, 2010 WL 2788025 (July 15, 2010) (colloquy between Senator Carper, the sponsor of the key language in the <u>Barnett</u> standard preemption provision, and Chairman Dodd).  The same understanding was stated by Senator Johnson.  <u>See</u> 156 Cong. Rec. S5889 (July 15, 2010).

[19]  Dodd-Frank Act section 1044(a), 124 Stat. at 2015.

used in the decision.  It is not the only formulation; it is not set apart from the others; and it is not presented as a test different from the others; rather, it is part of the whole of the Court's reasoning in its decision.  Thus, in the <u>Barnett</u> preemption provision, the phrase may serve as a touchstone or starting point in the analysis, but it takes meaning from the whole of the Supreme Court's decision.  Since the phrase must be "in accordance with the legal standard for preemption" in the <u>decision</u> of the Court, the analysis may not simply stop and isolate those terms from the rest of the decision; it is necessary to take into account the whole of the conflict preemption analysis in the Supreme Court's decision.[20]  Notably, a recent decision handed down by the 11th Circuit Court of Appeals cited other formulations of conflict preemption used in the <u>Barnett</u> decision for the conclusion that under the Dodd-Frank Act, the proper preemption test is conflict preemption.[21]

This result is supported by other precedent and portions of section 1044 of the Dodd-Frank Act.  The <u>Barnett</u> standard preemption provision uses language virtually identical to that used in section 104(d)(2)(A) of the Gramm-Leach-Bliley Act of 1999 (GLBA).[22]  The leading case applying that standard similarly treated the phrase "prevents or significantly interferes" as a reference to the whole of the Court's <u>Barnett</u> preemption analysis and referred to the GLBA statutory language as "the traditional <u>Barnett</u> <u>Bank</u> standards."[23]  Other portions of section 1044

---

[20]  The <u>Barnett</u> decision describes in detail the analysis under the <u>Barnett</u> conflict preemption standard.  517 U.S. at 33-34.

[21]  <u>Baptista v. JPMorgan Chase, N.A.</u>, __ F. 3d ___, (11th Cir. May 11, 2011) ("Thus it is clear that under the Dodd-Frank Act, the proper preemption test asks whether there is a significant conflict between the state and federal statutes—that is, the test for conflict preemption.").

[22]  <u>See</u> 15 U.S.C. 6701(d)(2)(A).

[23]  <u>Association of Banks in Insurance Inc. v. Duryee</u>, 270 F.3d 397, at 405, 408 (6th Cir. 2001).

similarly convey that the <u>Barnett</u> standard preemption provision refers to the legal standard for conflict preemption contained in the whole of the Court's decision.[24]

The OCC recognizes that the manner in which preemption under the <u>Barnett</u> case is stated in Dodd-Frank also could have been intended to clarify that standard relative to how current OCC regulations have distilled principles from the <u>Barnett</u> case.  Portions of our current regulations provide that state laws that "obstruct, impair, or condition" a national bank's powers are not applicable to national banks.  This formulation has created ambiguities and misunderstandings regarding the preemption standard that it was intended to convey.  We are therefore proposing to remove this language where it appears in our regulations and to remove 12 CFR 7.4009 in its entirety.  This language was drawn from an amalgam of prior precedents relied upon in the Supreme Court's decision in <u>Barnett</u>, and its elimination will remove any ambiguity that the conflict preemption principles of the Supreme Court's <u>Barnett</u> decision are the governing standard for national bank preemption.  To the extent any existing precedent cited those terms in our regulations, that precedent remains valid, since the regulations were premised on principles drawn from the <u>Barnett</u> case.  Going forward, however, that formulation would be removed as a regulatory preemption standard.

Accordingly, because the Dodd-Frank Act preserves the <u>Barnett</u> conflict preemption standard, OCC's rules[25] and existing precedents (including judicial decisions and interpretations)

---

[24]  The related requirement that the OCC must have "substantial evidence" on the record to support adoption of preemption rules or orders under this standard refers to the legal standard of the <u>Barnett</u> decision, not to a different standard based on a single phrase used in that decision, and thus incorporates the entirety of <u>Barnett's</u> conflict preemption analysis upon which the decision was founded.  <u>See</u> Dodd-Frank Act section 1044(a), 124 Stat. at 2016 (providing that regulations and orders promulgated under <u>Barnett</u> standard preemption do not affect the application of a state consumer financial law to a national bank unless substantial evidence made on the record of the proceeding supports the specific finding of preemption "in accordance with the legal standard of the decision of the Supreme Court of the United States in <u>Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.</u>, 517 U.S. 25 (1996).")

[25]  <u>See, e.g.</u>, 69 FR 1904 (Jan. 13, 2004).

consistent with that analysis are also preserved.[26]  We have reviewed those rules, taking into

account the definition of a state consumer financial law, to confirm that the specific types of laws

cited in the rules are consistent with the standard for conflict preemption in the Supreme Court's

Barnett decision.

We are also proposing clarifications to the OCC's preemption regulations regarding the

types of laws that would not be preempted under the Dodd-Frank Act provisions.  Specifically,

the proposal amends provisions of the regulations describing the types of state laws that are not

preempted, to make specific reference to the Barnett decision.

The OCC recognizes that going forward, after the transfer date, the Dodd-Frank Act

imposes new procedures and consultation requirements with respect to how we may reach

certain future preemption determinations and clarifies the criteria for judicial review of these

determinations.  Specifically, the Act requires that the OCC make preemption determinations

with regard to state consumer financial laws under the Barnett standard by regulation or order on

a "case-by-case basis" in accordance with applicable law.[27]  The Act defines "case-by-case

basis" as a determination by the Comptroller as to the impact of a "particular" state consumer

---

[26] See Letters from Acting Comptroller John Walsh to Senator Thomas R. Carper and Senator Mark Warner, May 12, 2011.  Earlier versions of the legislation would have had a retroactive impact by creating various new standards for preemption under the National Bank Act, invalidating an extensive body of national bank judicial, interpretive and regulatory preemption precedent.  See H.R. 4103, supra note 17.  The final version of the Dodd-Frank Act legislation did not adopt this approach.  Section 1043 of the Act, which dated from those early versions of the legislation, was not changed to reflect the final version of the legislation, but remains relevant in connection with changes in the treatment of preemption for national bank subsidiaries, and federal savings associations and their subsidiaries and agents.

[27] Dodd-Frank Act section 1044(a), 124 Stat. at 2015.

financial law on "any national bank that is subject to that law" or the law of any other state with substantively equivalent terms.[28]

When making a determination under this provision that a state consumer financial law has substantively equivalent terms as the law the OCC is preempting, the OCC must first consult with and take into account the views of the Consumer Financial Protection Bureau (CFPB) in making that determination.  We note that this consultation process synchronizes with the role and authorities granted to the CFPB under the Dodd-Frank Act.  It can inform the CFPB's exercise of its authority to enhance federal consumer protection rules, and that rulemaking process, in turn, includes consultation with appropriate prudential regulators.[29]

The Dodd-Frank Act also requires there to be substantial evidence, made on the record of the proceeding, to support an OCC order or regulation that declares inapplicable a state consumer financial law under the Barnett standard.  Finally, the Act requires the OCC to conduct a periodic review, subject to notice and comment, every 5 years after issuing a preemption determination relating to a state consumer financial law and to publish a list of such preemption determinations every quarter.[30]

     b.     Visitorial Powers

---

[28] Id.  This language was designed "to permit the OCC to make a single determination concerning multiple states' consumer financial laws, so long as the law contains substantively equivalent terms."  See S. Rep. 11-176, at 176 (April 30, 2010).  The Act contains no statement that Congress intended to retroactively apply these procedural requirements to overturn existing precedent and regulations, and that interpretation would be contrary to the presumption against retroactive legislation.  See e.g., Landgraf v. USI Film Products, 511 U.S., 272-73 (1994).

[29] Dodd-Frank Act section 1022(b), 124 Stat. at 1981.

[30] Dodd-Frank Act section 1044(a), 124 Stat. at 2016.

[3] <u>But see</u> the distinction drawn by the Supreme Court in <u>Easton v. Iowa</u>, 188 U.S. 220, 238 (1903), where the Court stated that "[u]ndoubtedly a state has the legitimate power to define and punish crimes by general laws applicable to all persons within its jurisdiction * * *. But it is without lawful power to make such special laws applicable to banks organized and operating under the laws of the United States." <u>Id</u>. at 239 (holding that Federal law governing the operations of national banks preempted a state criminal law prohibiting insolvent banks from accepting deposits).

* * * * *

(8) Any other law that the OCC determines to be applicable to national banks in accordance with the decision of the Supreme Court in <u>Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.</u> 517 U.S. 25 (1996), or that is made applicable by Federal law.

35. Amend § 7.4008 by:

a. Removing paragraph (d)(1);

b. Redesignating paragraph (d)(2) introductory text as paragraph (d) introductory text;

c. Redesignating paragraphs (d)(2)(i) through (x) as paragraphs (d)(1) through (10), respectively; and

d. Revising paragraphs (e) introductory text; and (e)(8).

The revisions read as follows:

**§ 7.4008 Lending.**

* * * * *

(e) <u>State laws that are not preempted</u>.  State laws on the following subjects are not inconsistent with the non-real estate lending powers of national banks and apply to national banks to the extent consistent with the decision of the Supreme Court in <u>Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.</u>, 517 U.S. 25 (1996):

* * * * *

(8) Any other law that the OCC determines to be applicable to national banks in accordance with the decision of the Supreme Court in <u>Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.</u>, 517 U.S. 25 (1996) or that is made applicable by Federal law.

## § 7.4009 [Removed and Reserved]

36. Remove and reserve § 7.4009.

37. Add § 7.4010 to read as follows:

## § 7.4010 Applicability of state law and visitorial powers to Federal savings associations and subsidiaries.

(a) In accordance with section 1046 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (12 U.S.C. 25b), state laws apply to Federal savings associations and their subsidiaries to the same extent and in the same manner that those laws apply to national banks and their subsidiaries.

(b) In accordance with section 1047 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (12 U.S.C. 1465), the provisions of section 5136C(i) of the Revised Statutes regarding visitorial powers apply to Federal savings associations and their subsidiaries to the same extent and in the same manner as if they were national banks or national bank subsidiaries.

## PART 8—ASSESSMENT OF FEES

38. The authority citation for part 8 is revised to read as follows:

**Authority:**  12 U.S.C. 16, 93a, 481, 482, 1467, 1831c, 1867, 3102, 3108, and 5412(b)(1)(B); and 15 U.S.C. 78c and 78 *l.*

_____//S//_____

Date:  May 19, 2011

John Walsh
Acting Comptroller of the Currency.